## ALEXANDER SPRUNT & SON, INC., ET AL. *v.* UNITED STATES.

No. 19. Argued October 31, November 1, 1929.—Decided April 14, 1930.

Messrs. *John W. Davis* and *R. C. Fulbright* for appellants.

*Mr. J. Stanley Payne,* with whom *Solicitor General Hughes* and *Messrs. George C. Butte* and *Daniel W. Knowlton* were on the brief, for the United States and Interstate Commerce Commission.

*Mr. Albert L. Reed,* with whom *Messrs. Mart H. Royston* and *C. B. Cochran* were on the brief, for Arkansas Cotton Trade Association et al., interveners.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

The Interstate Commerce Commission entered, on April 4, 1927, an order directed to the railroads operating in Oklahoma, Arkansas, Texas and Louisiana, which required them to remove, in a manner prescribed, undue prejudice and preference caused by their rates on cotton shipped from interior points to Houston and other ports on the Gulf of Mexico. *Application of Rates on Cotton to Gulf Ports,* 100 I. C. C. 159; 123 I. C. C. 685. Two suits, under the Act of June 18, 1910, c. 309, 36 Stat. 539, as amended by Urgent Deficiencies Act of October 22, 1913, c. 32, 38 Stat. 208, 220, were promptly brought in the federal court for southern Texas, to enjoin the enforcement of the order and to set it aside. The first suit was brought by Alexander Sprunt & Son, Inc., and others interested in cotton compresses and warehouses located at wharves on the waterfront. The second, by the Texas & New Orleans Railroad Company and other rail carriers. The two cases were, with the consent of the parties, ordered consolidated as a single cause with á single record. The consolidated case was heard by three judges. An interlocutory injunction issued. Upon final hearing, the District Court sustained the validity of the order; dissolved the injunction; and entered a decree dismissing the bills. 23 F. (2d) 874.

None of the carriers appealed from the decree. Acquiescing in the decision of the District Court, and in the order of the Commission, the railroads promptly established the prescribed rate adjustment; and it is now in force. This appeal was taken by Alexander Sprunt & Son, Inc., and those shippers and associations of shippers which had joined below as co-plaintiffs in the bill filed by it. No stay of the decree pending the appeal was granted or sought. And no railroad was made a party to the proceedings on the appeal. At the argument, this

Court raised the preliminary question whether there is any substantive ground for appeal by the shippers alone. In order to answer that question, a fuller statement is necessary of the matter in controversy before the Commission and of the terms of the order entered by it.

From interior points in Texas, Louisiana, Oklahoma and Arkansas to the several ports on the Gulf of Mexico there were on all the railroads two schedules of rates on cotton—the domestic or city-delivery rates and the export or ship-side rates. The latter were, prior to the entry of the order complained of, 3 or 3.5 cents per 100 pounds higher than the former. All rates permit concentration and compression in transit and include free switching, to and from the warehouses and compresses.[1] Complaint was made that in applying these rates the railroads unjustly discriminated against other shippers and in favor of Alexander Sprunt & Son, Inc., and other owners of warehouses and compresses at the wharves, by applying the domestic rates on shipments to their plants of cotton intended for export or for transshipment by vessel coastwise. It was sought to justify this practice on the ground

---

[1] Cotton is usually ginned at country points and put in bales weighing 525 pounds with a density of 11 or 12 pounds per cubic foot. Before these bales can be dealt in on the cotton exchanges they must commonly go through two further processes. Concentration—for purposes of merchandising; that is, grading and assorting into lots of quality and quantity demanded by the ultimate purchasers. Compression—for purposes of transportation; that is, reducing the size of the bale by increasing its density, which, in order to secure favorable rail rates, must commonly be 22.5 pounds per cubic foot, and, in order to secure favorable vessel rates, must commonly be 32 pounds per cubic foot. The former is called standard density; the latter, high density. Some concentration and high density compression plants are located at interior points. Many are located in the ports, at places remote from the water-front, or the wharves. These are called up-town plants. Since 1921, several plants have been located at the water-front, in close proximity to the vessels by which the cotton is shipped abroad or coastwise.

that the conditions which had led to charging the higher rate for export cotton were absent in the case of these water-front plants.

The difference of about 3.5 cents per 100 pounds between the domestic and the export rates is approximately equal to the cost of transporting the cotton, by dray or by switching, from up-town concentrating and high density compressing plants in· the ports to ship-side. This difference served to equalize rates as between the up-town plants and the interior plants. *Louisiana Cotton*, 46 I. C. C. 451; *Galveston Commercial Asso.* v. *Alabama & Vicksburg Ry. Co.*, 77 I. C. C. 388. In 1921, and later, warehouses and high density compressing plants were located at the water-front, almost within reach of ·the ship's tackle. From these plants, there was no need of local transportation by dray or switching, to ship-side. The lower domestic rates were accordingly applied on cotton shipped to them, even though intended for export.

This practice gave to the water-front plants an obvious advantage over those located up-town in the ports and over those located in the interior. Widespread complaint of undue prejudice and preference led the Commission to institute upon its own motion, a general investigation concerning the lawfulness of the practices of the carriers in connection with the application of the city-delivery and ship-side rates, with a view to determining, among other things, " whether any change should be made in existing tariff regulations or rates in order to avoid or remove such undue preference, if any, that results or may result in favor of said water-front shippers or localities."[2] Practically all the railroads operating in the four southwestern states were made respondents to that proceeding.

[2] With this general investigation, there was consolidated a formal complaint, Weatherford, Crump & Co. *v.* Abilene & Southern Ry. Co. et al., which had been filed earlier. 100 I. C. C. 159, note 1.

After extended hearings, the Commission found that the existing adjustment of rates to ports was unduly prejudicial to the warehouses and compresses up-town and in the interior; that it was unduly preferential of those at the water-front; and that the rates should be readjusted so that one rate would apply for all deliveries within the usual switching limits of the respective ports, except that the export rates should be made higher than the domestic rates by an amount equal to the wharfage. The Commission did not, at first, specify the particular rate adjustment to be established to accomplish the result directed. Without inquiring into the reasonableness of the rates, it stated that the equality of treatment might be effected by any readjustment which would preserve, but not increase, the carriers' revenues. 100 I. C. C. 159, 167. But upon reopening the proceeding, pursuant to petitions therefor, the Commission prescribed specifically what the rate adjustment should be. It found that " for the purposes of this case, a fair and reasonable basis for equalizing the city-delivery and ship-side rates will be to increase the city-delivery rates 1 cent per 100 pounds and reduce the ship-side rates, exclusive of wharf or pier terminal charges equivalent to 2 cents per 100 pounds, to the basis of the increased city-delivery rates." 123 I. C. C. 685, 695.

*First.* The appellants contend that there is no basis for the Commission's finding of undue prejudice and preference. We are of opinion that appellants have no standing, in their own right, to make this attack. In so far as the order directs elimination of the rate differential previously existing, it worsened the economic position of the appellants. It deprived them of an advantage over other competitors of almost 3.5 cents per hundred pounds. The enjoyment of this advantage gave them a distinct interest in the proceeding before the Commission under § 3 of the Interstate Commerce Act. For, their competitive advan-

tage was threatened. Having this interest, they were entitled to intervene in that administrative proceeding. And if they did so, they became entitled under § 212 of the Judicial Code to intervene, as of right, in any suit " wherein is involved the validity " of the order entered by the Commission.[3] But that interest alone did not give them the right to maintain an independent suit, to vacate and set aside the order. Such a suit can be brought by a shipper only where a right of his own is alleged to have been violated by the order. And his independent right to relief is no greater where by intervention or otherwise he has become a party to the proceeding before the Commission or to a suit brought by a carrier. In the case at bar, the appellants have no independent right which is violated by the order to cease and desist. They are entitled as shippers only to reasonable service at reasonable rates and without unjust discrimination. If such service and rates are accorded them, they cannot complain of the rate or practice enjoyed by their competitors or of the retraction of a competitive advantage to which they are not otherwise entitled. The advantage which the appellants enjoyed under the former tariff was merely an incident of, and hence was dependent upon, the right, if any, of the carriers to maintain that tariff in force and their continuing desire to do so.

Why the carriers filed the new rate structure now in force is no concern of the appellants. If the carriers had done so wholly of their own motion, obviously these shippers would have had no ground of complaint, before any tribunal, unless the new rates were unreasonable or unjust. If they were believed by the appellants to be so, a complaint before the Commission would be the appropriate remedy. *Texas and Pacific Ry. Co.* v. *Abilene*

---

[3] Originally the Commerce Court Act, June 18, 1910, c. 309, 36 Stat. 542; U. S. C., Tit. 28, § 45a.

*Cotton Oil Co.,* 204 U. S. 426; *United States* v. *Merchants & Manufacturers Traffic Association,* 242 U. S. 178, 188; *Great Northern Ry. Co.* v. *Merchants Elevator Co.,* 259 U. S. 285, 295. The appellants' position is legally no different from what it would have been if the carriers had filed the rates freely, pursuant to an informal suggestion of the Commission or one of its members; or if the filing had been made by carriers voluntarily after complaint filed before the Commission, which had never reached a hearing, because the rate structure complained of was thus superseded.[4] The carriers who were respondents before the Commission filed the new rates presumably because they now desire them. Nothing to the contrary is shown. So far as the carriers are concerned, it is as if the new rates had been filed wholly of their own accord and as if there had never been a controversy before the Commission. Since the appellants' economic advantage as shippers was an incident of the supposed right exercised by the carriers, the appellants cannot complain after the carriers are satisfied or prefer not to press their right, if any.

Appellants' present position resembles in all essentials one which was put forward in *Edward Hines Trustees* v. *United States,* 263 U. S. 143, 147, 148 and *United States* v. *Merchants & Manufacturers Traffic Association,* 242 U. S. 178, 188. There, as here, the plaintiffs were deprived by the order of the Commission of a competitive advantage. But the plaintiffs there, as here, were not

---

[4] Compare Rules of Practice (Revised to December 2, 1919) IV(i); Manufacturers' & Jobbers' Union of Mankato *v.* Minneapolis & St. Louis Ry. Co., 1 I. C. C. 227; Lincoln Board of Trade *v.* Union Pacific Ry. Co., 2 I. C. C. 229; The Pennsylvania Co. *v.* Louisville, New Albany & Chicago Ry., 3 I. C. C. 223; American Wire Nail Co. *v.* Queen & Crescent Fast Freight Line, 3 I. C. C. 224; Alan Wood Iron & Steel Co, *v.* Pa, R, R, Co., 24 I. C. C. 27, 33.

subjected to or threatened with any legal wrong. And, since the carriers acquiesced in the order of the Commission, the plaintiffs could not maintain an independent action to annul the order. Appellants' present position is unlike that of the plaintiffs in the cases relied upon. *United States* v. *Village of Hubbard,* 266 U. S. 474; *The Chicago Junction Case,* 264 U. S. 258; *Skinner & Eddy Corporation* v. *United States,* 249 U. S. 557; *Interstate Commerce Commission* v. *Diffenbaugh,* 222 U. S. 42. In each of those cases, an independent legal right of the plaintiff was affected by the order which it was sought to set aside.[5]

Moreover, by the action of the carriers, the issue of undue prejudice and unjust preference, which had been passed upon by the Commission, has become moot. Compare *United States* v. *Anchor Coal Co.,* 279 U. S. 812. Most of the carriers never sought to annul the order. Those that joined in the suit to set it aside have since voluntarily severed themselves from the shippers who object

---

[5] Two suits were involved in the *Diffenbaugh* case. One was against a carrier to recover allowances for substituted transportation facilities alleged to be due under § 15 of the Act. The Interstate Commerce Commission was joined and its order prohibiting the allowances sought to be enjoined because the order would otherwise have constituted a defense to the suit. In the other action, interested carriers intervened as parties plaintiff and persisted in their effort to set aside the order. In *Skinner & Eddy Corporation* v. *United States,* the right under the last paragraph of § 4 of the Act, not to pay increased rates except when due to reasons other than the elimination of water competition, was clearly the right of the shipper. In the *Chicago Junction Case,* the order violated the plaintiff's right under paragraph 2 of § 5 to equal treatment; and the plaintiff, with those similarly situated, was the only person in interest against the order. In the *Hubbard* case, the challenged order increasing rates was alleged to violate a contract between the plaintiff and the carrier, who, it was alleged, was not subject to the jurisdiction of the Commission.

to it. The fact that some carriers at one time protested is of no significance, among other reasons, because their protest may have been directed, not against that part of the order which commanded an equalization of rates, but against the particular figure at which equalization was ordered.[6] There is nothing to show that any carrier is now in sympathy with the appellants' attack on the order. A judgment in appellants' favor would be futile. It would not restore the appellants to the advantage previously enjoyed. If the Commission's order is set aside, the carriers would still be free to continue to equalize the rates; and for aught that appears would continue to do so.

*Second.* Appellants complain of the order also on the ground that it authorized an increase in the local or domestic delivery rates without a hearing and findings as to the reasonableness of the level of either the old or the new rates. It is urged that § 15 of the Act does not authorize the Commission to fix the rates necessary to remove undue prejudice without such hearing and findings. But plainly appellants cannot, in their own right, be heard to complain in this suit of this part of the order. The Commission's first order left the carriers free to choose the method for the removal of the preference. Compare *American Express Co.* v. *Caldwell,* 244 U. S. 617, 625; *United States* v. *Illinois Cent. R. R. Co.,* 263 U. S. 515, 521. If the carriers had, of their own accord, adopted the plan later prescribed by the Commission, appellants could, obviously, not be heard to complain of the reasonableness of the rate adopted, except in a proceeding before the Commission instituted under §§ 13 and 15 of the Act. For reasons which it is unnecessary to detail, the carriers were unable to agree upon a plan. They petitioned the

---

[6] See 123 I. C. C. 685, 693; 23 F. (2d) 874, 876.

Commission for help. In reopening the proceedings, the Commission notified the parties that one of the issues to be decided was "what rates shall be established to comply with [its] findings and order." The carriers have accepted the rate fixed by the Commission. In prescribing the rate, the Commission in no way prejudiced any pre-existing rights or remedies of the appellants. Any question as to the reasonableness of the level of the rate was expressly left open by the Commission.[7] It did not prescribe any rate as the minimum. If appellants are aggrieved by the level of the new rates, they still have their remedy before the Commission under §§ 13 and 15 of the Act.

*Third.* The appellants urged a further objection. In order to avoid congestion in heavy traffic periods and undue detention of cars, shippers from uptown warehouses customarily deliver their cotton to shipside by dray or barge, in lieu of switching by the carriers; and they are paid allowances by the carriers for this substituted service. The Commission's first report stated: "This finding is not to be construed as condemning the practice of the carriers of absorbing drayage charges in lieu of switching." 100 I. C. C. 159, 167. In its second report, the Commission reaffirmed this position. But in response to questions raised by the carriers, it stated that no allowances could lawfully be made with respect to what it termed the "intraplant" movement by hand truck, overhead trolley, etc., to ship-side from warehouses and compresses on and adjacent to the wharves operated as part

---

[7] The Commission said, with reference to the rate, "the . . . finding is without prejudice to further inquiry into the reasonableness of the above rates in connection with other cases now pending." 123 I. C. C. 685, 695.

of such warehouses or compresses.[8]   Appellants urge that this prohibition is arbitrary and should be enjoined.

The question of these allowances was only incidentally raised in the proceedings before the Commission. It made no order with respect to them. The statements complained of appear only in the report and are not specifically referred to in the order. The Commission recognized the right of shippers to allowances for substituted transportation service furnished by them. It did not undertake to define what such services might be for all cases. Nor did it specifically refer to the services rendered by any of the appellants. Indeed, appellants insist that their warehouses or compresses are not operated as part of or in conjunction with the adjacent wharves or piers. If, under their contracts with carriers, the appellants perform services which properly should be performed by the carriers, the appellants are free to demand allowances therefor and to enforce their demands by appropriate proceedings before the Commission and in the courts. In such proceedings, specific issues will be presented and decided.

The decree below dismissed the consolidated suit on the merits. As the matter insofar as it relates to the bill filed by these appellants has become moot since the decree was entered, the decree, should be reversed, so far as it

---

[8] " But upon cotton delivered to shipside from and by water-front warehouses or compresses over adjacent wharves or piers operated as a part of, or in conjunction with, such warehouses or compresses, a different condition exists. The hand or electric trucking, or movement by overhead trolley, from the part of the water-front facility known as the warehouse or compress to that part known as the wharf is not a substitute for rail transportation, but is an intraplant movement just the same as the handling of cotton from the interior of an uptown warehouse to the railroad car or dray is an intraplant movement. No allowance may lawfully be made for these intraplant movements." 123 I. C. C. 685, 697.

concerns appellants; and the District Court should be directed to dismiss their bill without costs. See *United States* v. *Anchor Coal Co.*, 279 U. S. 812. So far as concerns the carriers—no appeal having been taken by them —the decree entered below should stand.

*Reversed with direction to dismiss.*

The CHIEF JUSTICE did not take part in this case.