MOFFAT TUNNEL LEAGUE et al. v. UNITED STATES et al. (DENVER & S. L. RY. CO. et al., Interveners).

No. 909.

District Court, D. Delaware.

June 18, 1932.

Albert L. Vogl, of Denver, Colo., and John J. Morris, Jr., of Wilmington, Del., for plaintiffs.

Leouard E. Wales, U. S. Atty., of Wilmington, Del., and Elmer B. Collins, Sp. Asst. to Atty. Gen., for the United States.

Nelson Thomas, of Washington, D. C., for Interstate Commerce Commission.

H. Brua Campbell (of Pierce & Greer), of New York City, and Clarence A. Southerland (of Ward & Gray), of Wilmington, Del., for defendant Denver & R. G. W. R. Co.

Elmer L. Brock, of Denver, Colo., and Dudley C. Lunt, of Wilmington, Del., for intervener Denver & S. L. Ry. Co.

Norton Montgomery, of Denver, Colo., and Howard Duane, of Wilmington, Del., for interveners Moffat Tunnel Imp. Dist., Herbert C. Fairall and others.

Colin A. Smith, Asst. Atty. Gen., for the State of Colorado and Public Utilities Commission of Colorado.

Suit in equity before the court constituted as provided by section 266 of the Judicial Code (28 USCA § 380).

Before WOOLLEY and THOMPSON, Circuit Judges, and NIELDS, District Judge.

WOOLLEY, Circuit Judge.

The plaintiffs, by petition in the nature of a bill in equity, ask this court to annul and, by appropriate relief, enjoin the execution of an order of the Interstate Commerce Commission authorizing the Denver and Rio Grande Western Railroad Company to acquire stock control of the Denver and Salt Lake Railway Company. This control carries with it the right and duty on the part of the Rio Grande to construct a cut-off, known as the Dotsero Cut-Off, which when completed will connect the two railroads and bring about transportation and economic changes in the zones affected thereby.

This suit, however, presents only the last phase of a railroad question which has engrossed the attention of the public in Colorado for more than a decade. In order to understand what until lately was a many sided controversy it will be necessary to state its origin, and trace, in bare outline, the currents that have brought it to its present form.

Owing to great distances traversed and broad spaces served, railroads in the West assume perhaps a more serious importance to every one than in smaller and more densely populated sections of the East. Moreover, problems of railroad construction and operation are there more difficult and sometimes more expensive because of natural barriers. These are matters which enter generally into nearly every railroad question arising in that section and enter particularly into the questions involved in this suit.

The first fact that stands out is one of nature. It is the Continental Divide. That high range of mountains crosses the State of Colorado from north to south and, being inevitably encountered, has to be overcome by any transcontinental railroad system.

Many years ago the Denver and Rio Grande Railroad Company projected a rail-

road between Denver and Salt Lake City. The Continental Divide stood in the way of a direct line east and west. While it could not avoid this barrier, the company overcame some of its difficulties by starting its line at Denver, running it southwardly along the eastern slope of the foothills to Pueblo, thence northwestwardly at relatively low grades along the tortuous bottom of the Royal Gorge. Emerging from this water level, it ascends the Divide by heavy grades to Tennessee Pass at an elevation of about 11,000 feet whence it descends by grades equally heavy and runs on to Salt Lake City, a distance in all of 750 miles.

Later, the Atchison, Topeka and Santa Fé Railroad and Missouri Pacific Railroad connected with the Rio Grande at Pueblo, thus making links in what in effect is a transcontinental system. But Denver, with the Union Pacific Railroad far to the north, stood solitary and outside the movement of transcontinental traffic. Though it had direct eastern connections, it had no direct western connection. Regarding this as a commercial handicap, it had long dreamed of being situated on a direct road from east to west. Years later, David Moffat, a Denver pioneer, in an effort to realize this dream, organized the Denver and Salt Lake Railway Company (the Moffat Road), to build a railroad between Denver and Salt Lake City, and at those cities to connect with roads running east and west. Starting at Denver, the line ran westwardly and boldly attacked the Continental Divide by rising over it at very heavy grades and descending at equally heavy grades. On reaching Orestod, it turned northwardly to Steamboat Springs and then westwardly to Craig where it stopped and where the end of the road has remained ever since. In other words, it got about one-third of its way to Salt Lake City, starting at a large commercial center and ending at a place economically unimportant and in a region of very little traffic.

Because of heavy grades and small business, operations of the Moffat Road were so unprofitable, and the prospect of its further extension west was so dim, that in 1919 (Laws 1919, p. 669) the Legislature of the State of Colorado passed a law looking to the acquisition of the road, the building of a tunnel through the mountains and the extension of the road through sparsely settled portions of the state as far west as the Colorado boundary. In 1921 (Laws 1921, p. 744) the Legislature repealed this law and the next year at a special session enacted a law which established the Moffat Tunnel Improvement District composed of counties in Colorado through which the road ran and was intended to run, including the City of Denver, and created the Moffat Tunnel Commission with authority to raise money on bonds of the District, being liens upon all real estate therein, and with the money to drive a tunnel through the Divide for use of the Moffat Road and any other road with which it would make terms. Money was raised, and the tunnel constructed. It was then leased to the Moffat Road. Profits increased as costs of operation decreased. Still the road, starting some place and going nowhere, could not even with the aid of the tunnel achieve the object for which it was built. Always cherishing the hope of being situated on a transcontinental rail system, Denver developed the idea that such a hope could with some approximation be realized if the Rio Grande and Moffat Railroads, being somewhat parallel at irregular distances apart, could be connected at the point where they approached one another most closely. That was at places called Dotsero on the Rio Grande and Orestod on the Moffat Road, forty-one miles apart, and—what is most important—it was beyond the western opening of the tunnel and, accordingly, beyond the heavy grades of the Divide. Such a connection, cutting out the Pueblo salient, would shorten the haul from Denver to Salt Lake City one hundred and seventy-three miles at a saving of eight hours in time and much money in operating the shorter distance and in avoiding heavy grades.

In order to carry out this idea the Moffat Road, through a subsidiary, applied to the Interstate Commerce Commission for authority under a certificate of public convenience and necessity to build the Dotsero Cut-Off. At the hearings on its application there were many intervenors representing about all interests, personal, commercial, industrial, corporate, municipal and state, that would be affected in one way or another by a grant or refusal of the authority applied for. Some opposed the move; all were watchful. Particularly the application was opposed by the Rio Grande on a representation that unless it were given trackage rights over the Cut-Off when completed and trackage rights over the Moffat Road between Orestod and Denver it could not safely route shipments from Salt Lake over these connections through Denver, and if it could not so route its through traffic it would, because of heavy grades and the longer haul of one hundred and seventy-three miles, fail in competition

with other roads, particularly in handling California deciduous and citrous fruits.

The Commission found that the public convenience and necessity required the construction of the Cut-Off but refused its permission to the Moffat Road to build it until the two roads should come to an agreement as to trackage rights over the Cut-Off and over the Moffat Road between Orestod to Denver.

The plaintiffs in the instant suit were neither parties nor intervenors in that proceeding and, seemingly, were content with the Commission's order which, as they construed it, tended to improve the business and profits of the Moffat Road and to further the hope of its extension west toward Salt Lake City.

But the two roads could not agree upon trackage rights, the condition precedent to permission to build the Cut-Off.

So matters stood until the Rio Grande began to buy and acquire stock of the Moffat Road. Holding only a minority of its shares, the Rio Grande, on February 1, 1930, applied to the Interstate Commerce Commission, as required by law, for leave to acquire by purchase stock control of the Moffat Road. That application is the genesis of the order of the Commission here in question. Again, nearly every one in Colorado, represented in one way or another, appeared as intervenors. They included the Moffat Tunnel Improvement District, Moffat Tunnel Commission, Denver Chamber of Commerce, Denver Union Stockyard Company, Denver Real Estate Exchange, Salt Lake and Denver Railroad Company, Utah Shippers' Traffic Association, Moffat Tunnel Taxpayers' Association, and many other bodies not necessary to mention. Among the intervenors however, it is important to note, were the State of Colorado and the two plaintiffs in this suit, the latter objecting on the contentions that if the Rio Grande be allowed to gain control of the Moffat Road and the Cut-Off to be built, it would naturally foster traffic from Denver through Orestod and Dotsero to Salt Lake City (and traffic in the reverse direction) over a portion of its old line and would be opposed to the extension of the Moffat Road from Craig to the Uintah Basin to the permanent injury of Northwestern Colorado and Eastern Utah, and that the prong of the Moffat Road upwardly extending from Orestod to Steamboat Springs and Craig would become a mere branch line with probably insufficient service.

The differences in the more or less conflicting interests of the many parties to the proceeding were composed by a finding of the Commission, announced on December 2, 1930, that the proposed stock acquisition would be in the public interest, but at that time no order was entered, and the record was held open for the filing by the Rio Grande of its acceptance of three conditions:

(1) That it should purchase for cash, at not exceeding $155 per share, any share of the capital stock and/or voting trust certificates of the Moffat Road which might be offered for purchase within six months from the date of the order to be entered (thus protecting minority stockholders); (2) that it, through the Moffat Road, should establish such through routes in connection with any western connections hereafter constructed under the Commission's authority as it might find in subsequent proceedings to be reasonable and in the public interest (whereby the gateway to Northwestern Colorado was kept open); and (3) that it, through the Moffat Road, should commence the construction of the Dotsero Cut-Off within six months of the date of an order to be entered authorizing the proposed acquisition and control and should complete such construction within two years from beginning it (thus insuring an early completion of the project).

On July 17, 1931, the Rio Grande filed a formal acceptance of these three conditions, qualified only by the substitution of itself for the Moffat Road as the medium through which the construction of the Cut-Off should be prosecuted. The order which was entered accordingly is the one which the plaintiffs in this suit urge is invalid and pray should be annulled.

There are several questions in this case. The primary and fundamental one, arising on motions to dismiss the petition, concerns the plaintiffs' right to institute and maintain this action to annul the Commission's order, and grows out of the related questions: What interest have they in the order and what injury would they sustain by its enforcement? While a decision of this question adverse to the plaintiffs would, so far as this court is concerned, be dispositive of the litigation, we conceive it might not, on review, be dispositive of the controversy. Realizing that it is highly important to the public in Colorado as well as to the corporate interests directly concerned that this litigation should not stagger from tribunal to tribunal but should be brought to an end as speedily as is consistent with orderly procedure, we shall pass upon and decide all questions presented, even if our disposition of the first question should

be against the plaintiffs' right to maintain the action.

The initial phase of the first question prompts the inquiry: Who or what are the plaintiffs?

■ Although it is not necessary in an action of this kind that the plaintiffs should be citizens of a state to show diversity of citizenship and establish jurisdiction, it is necessary that they show who or what they are preliminarily to a determination of their interest in the controversy and their right to maintain the action.

These plaintiffs are unincorporated associations. Who are their personal members is not disclosed. Rather, they represent groups of persons social and civic in character, such as commercial clubs, the Lions, Kiwanis and Rotarians, resident mainly in the three counties of Colorado west of the Moffat Tunnel and in the Uintah Valley of the State of Utah, sections not yet reached by the Moffat Road. We gather from the argument, their main interest is that of members of the public who, feeling that the order of the Commission darkens the hope of a westward extension of the Moffat Road, regard the order as detrimental to public interests in certain parts of the States of Colorado and Utah. That is, they represent, informally, that part of the public which entertains views opposed to those entertained by other parts of the public which are here as parties or intervenors in opposition to the plaintiffs' action. The latter are not social or civic organizations, but are municipal and state organizations such as the Moffat Tunnel Improvement District, the Moffat Tunnel Commission, and the Public Utilities Commission of the State of Colorado, appearing by the Attorney General of Colorado.

Coming to the second phase of the first question, the plaintiffs have not disclosed, either in the pleadings or by testimony, that they have a legal interest in the Commission's order. By the same token they have failed to show that they would sustain injury by its execution. Therefore, if the plaintiffs had first appeared in this controversy by instituting this suit to annul the order, they clearly would fail to show a right to maintain it. But they say, even so, they have a right to maintain the action because of their right to intervene and their actual intervention in the proceedings before the Commission.

■ It cannot be questioned that such organizations as the Moffat Tunnel League and the Uintah Basin Railroad League, now plaintiffs in this suit, had a right to intervene and be heard in proceedings before the Commission. That right was given them by statute. 28 USCA § 45a. Unless the statute gives intervenors, as such, a right to institute independent suits to enjoin the action of the Commission (and we find none), their right so to institute suits remains as at general law, which is, first, that voluntary, unincorporated associations of persons do not have a legal capacity to sue, St. Paul Typothetae v. St. Paul Bookbinders' Union, 94 Minn. 351, 102 N. W. 725, 3 Ann. Cas. 695; Moore v. Burns, 60 Ala. 269; Moskal v. New Era Commercial Association, 228 Ill. App. 278; and, second, if otherwise capable to sue, they must have a legal right arising from a legal interest, the denial of which inflicts or threatens a legal wrong. Sprunt & Son v. United States, 281 U. S. 249, 50 S. Ct. 315, 74 L. Ed. 832; Pittsburgh & W. Va. Railway Co. v. United States, 281 U. S. 479, 50 S. Ct. 378, 74 L. Ed. 980; Pennsylvania Railroad Co. v. United States (D. C.) 40 F.(2d) 921; Indian Valley R. R. Co. v. United States (D. C.) 52 F.(2d) 485.

Parties that have a legal interest in the Commission's order are undoubtedly the United States, the two railroad companies, the Moffat Tunnel Improvement District, the Moffat Tunnel Commission, the Public Utilities Commission of the State of Colorado and the State of Colorado, all of which are present as parties or intervenors in this suit by permission of the statute. As all acquiesce in the Commission's order, they are in a very different position from the plaintiffs who have the burden of overturning the order by showing a right to do so.

■ The Supreme Court distinguishes between the right to intervene in a proceeding before the Commission afforded by the statute and the right to bring a suit to set aside an order of the Commission. Although the contrary might be gathered from the decisions in the Chicago Junction Case, 264 U. S. 258, 267, 44 S. Ct. 317, 68 L. Ed. 667, Interstate Commerce Commission v. Diffenbaugh, 222 U. S. 42, 32 S. Ct. 22, 56 L. Ed. 83, the later cases of Sprunt & Son v. United States, 281 U. S. 249, 50 S. Ct. 315, 74 L. Ed. 832; Pittsburgh & W. Va. Ry. Co. v. United States, 281 U. S. 479, 486, 50 S. Ct. 378, 74 L. Ed. 980; Hines Yellow Pine Trustees v. United States, 263 U. S. 143, 44 S. Ct. 72, 68 L. Ed. 216; Pennsylvania Railroad Company v. United States (D. C.) 40 F.(2d) 291 (through which the evolution of the law can be discerned), clearly rule that an interest which may give a person the right to in-

tervene in a proceeding before the Commission does not necessarily give him the right to maintain an independent suit to vacate an order of the Commission and that such a suit can be brought and maintained by a person, whether an intervenor or otherwise, only when he shows a legal right which has been violated by the order with a resulting actual or threatened legal injury.

The difference in the statute and the distinction made by the courts are elementary. Intervention in proceedings before the Commission may be commercial, public or quasi public; the right to maintain an action to annul an order of the Commission is purely legal. Though the Commission has quasi judicial powers, its functions are administrative. Its deliberations therefore are informal and open to almost anybody who has anything to say. A legal interest that is actionable and a resultant injury are not legal prerequisites to the right to intervene before the Commission. But when that tribunal has reached a final decision in the form of an order, a suit to set it aside can be brought only by a person with the legal qualifications we have named. Such a suit is original in character; it is not an appeal or a petition to review. We therefore find that the plaintiffs, being voluntary, unincorporated associations, cannot as such maintain this suit; that, aside from this legal infirmity, these associations have not shown such an interest or right in the Commission's order or proved a threat of an injury resulting from its enforcement that would authorize them to maintain this action; and, finally, that this legal disqualification is not cured or aided by the statute (28 USCA § 45a), in that it does not give them a right to institute this action solely because of their position as intervenors in the proceedings before the Commission. Postponing decision on these findings for the moment, we shall discuss the other questions in the case as though the one relating to the plaintiffs' right to sue were not involved.

Of these questions the principal one is:

Did the Commission afford the intervenors (now plaintiffs) a fair hearing?

■ Realizing that much of this controversy had already been decided by the Commission in the previous Cut-Off proceedings, the Examiner was firm in holding the examination to the single ultimate question of public interest involved in the proposed stock purchase and control of one railroad by the other. The intervenor-plaintiffs however wished to open up the controversy from the beginning and introduce evidence on nearly every phase, including the views of witnesses who had, when the controversy was raging in the public press and on the public platform, expressed themselves in a particular way. An analysis of the hearing indicates that some of the matters excluded were not offered in evidence by plaintiffs' counsel but by counsel representing other intervenors of which we think the plaintiffs cannot avail themselves in this suit. These were matters for the others to complain about. This they have not done. On the contrary, they are here in support of the order of the Commission. Some of the matters that the intervenor-plaintiffs desired to introduce were not pertinent to the precise issue then involved. Moreover, they had nothing tangible on which to base objections to the stock acquisition. Neither the plaintiffs nor any one else had a plan to do what all (with the probable exception of the Rio Grande) desired, namely; the extension of the Moffat Road west from Craig to the Uintah Basin. Nor was there any evidence of a likelihood of any plan being made until traffic conditions should inspire one.

■ The intervenor-plaintiffs suggest that if the Commission's order should, as they urge, be annulled, the first order authorizing the Moffat Road to build the Cut-Off would stand. Yet, if that be true, it would stand with its unperformed condition as to trackage rights, and the situation would remain as it has stood through the years with no immediate prospect of building the Cut-Off, which every one wants, and certainly no prospect even remote of an extension of the Moffat Road from Craig to the west. Such an extension would, without regard to ownership and control, inevitably depend on traffic conditions. So it appears that the exclusion of evidence was not prejudicial to any rights which the plaintiffs claimed but was only disturbing to their hope that some how, some time, in some way the Moffat Road would be projected from Craig westwardly. Yet under the Commission's order the realization of that hope is preserved, for it expressly leaves open the way westward and makes it just as possible to extend the road with the order in force as to extend it with the order annulled. True, certain traffic benefits might conceivably enure to the Rio Grande by the acquisition, of which it might take unfair advantage, but the unfairness of future actions of the Rio Grande, not to be anticipated, can of course be controlled, as is always the case, by future applications to the Commission. Really all that the present order does adversely to the plaintiffs, on their own showing, is to disturb their hope of an early extension of

766

the Moffat Road westward. Without doubt it will, until something else happens, defer their hope. But that, standing alone, is not a legal injury of which the plaintiffs can complain in an action in equity.

The next question is whether the order allowing the acquisition of one road by the other is in the public interest.

That is a question solely for the Commission. This court has no right to express its views or impose its judgment upon this subject. It may, however, consider the underlying question, whether the order is. supported by evidence.

All the evidence is directed to the question of public interest in one phase or another. Practically the whole State of Colorado, as we have shown, was represented as parties or intervenors. Certain parts of the public in Utah were also represented. The main actors were the two railroad companies; the. Public Utilities Commission of the State of Colorado; the State of Colorado itself; and, lastly, the Moffat Tunnel Improvement District and its official body the Moffat Tunnel Commission, the parties perhaps most vitally interested. With all these municipal and governmental organizations of the State of Colorado favoring the order of the Commission, we find, as would likely be the case, that the testimony they presented on the question of public.interest amply supports the order.

. The motions to dismiss the petition are granted and, to make the judgment complete, the prayer of the petition for a preliminary injunction is, after a full hearing, denied, and the prayer for a permanent injunction (on a stipulation of counsel that the case on the hearing should stand submitted for final decision) is denied.