## DELAWARE & H. R. CORPORATION v. UNITED STATES.

### No. 1266.

District Court, M. D. Pennsylvania.

June 1, 1937.

Paul Bedford, of Wilkes-Barre, Pa., and Daniel P. Loomis, of New York City, for plaintiff Delaware & Hudson R. Corporation.

Elmer B. Collins, Sp. Asst. to the Atty. Gen., for the United States.

Thomas M. Ross, of Washington, D. C., for the Interstate Commerce Commission.

Edwin A. Lucas and Drinker, Biddle & Reath, all of Philadelphia, Pa., for Penn Anthracite Collieries Co.

Before BIGGS, Circuit Judge, and JOHNSON and WATSON, District Judges.

BIGGS, Circuit Judge.

This suit is one brought by the Delaware & Hudson Railroad Corporation pursuant to the provisions of the Urgent Deficiencies Act, title 28, U.S.C.A. §§ 41(28), 43–48, inclusive, to enjoin and annul an order of the Interstate Commerce Commission, dated the 18th day of December, 1936, and providing, inter alia, that the Central Railroad of New Jersey, New York, Ontario & Western Railway Company, and the Delaware & Hudson Railroad Corporation, should establish and thereafter maintain a rate to be applied to the "transportation of anthracite, in car loads, from Von Storch Colliery, in Scranton, Pa., over the lines of the New York, Ontario and Western Railway Company and The Central Railroad of New Jersey, via Scranton, to points in New Jersey on the Central Railroad of New Jersey * * * which (rate) shall not exceed corresponding single-line rates for like sizes of anthracite, in car loads, contemporaneously maintained by The Central Railroad Company of New Jersey from mines on its line in the Wyoming region to the same destinations."

The Von Storch Colliery is owned and operated by Penn Anthracite Mining Company, one of the interveners herein, and at all times pertinent to the questions presented by the case at bar has been within the limits of the incorporated city of Scranton. It is on the lines of both the Ontario & Western and the Delaware & Hudson at the present time. Originally all of the coal for the Von Storch Colliery was taken from two mines within the city of Scranton and on the line of the Delaware & Hudson, but just prior to 1931, when the original coal supply became depleted, Penn Anthracite purchased nine other mines, all of which are upon the lines of the Ontario & Western, and, procuring a low run of the mine (inbound) rate, from one to six cents per ton, a minimum of six cents, from the Ontario & Western, caused this coal to be shipped to the Von Storch Colliery for cleansing and sizing. Eighty per centum of the coal which the Von Storch Colliery obtains is from the nine additional mines referred to. The Ontario & Western did not build a connection to the Von Storch Colliery until 1931.

Rates and differences in rates are referred to in this opinion in amounts per ton of 2,240 pounds.

Division 4 of the Interstate Commerce Commission found the rates in issue to be as follows: "(1) joint rates on anthracite from complainant's colliery switched for the Delaware & Hudson by the Western to Green Ridge, Pa., thence hauled over that line to Wilkes-Barre, Pa., and thence over the Central of New Jersey; and (2) combination rates to the same destinations, composed of the local rate of 75 cents over the Western from Park Place to Scranton and thence proportional rates of the Central of New Jersey. These combination rates are from 87 cents to $1.43, generally 87 or 88 cents higher than the single-line rates of the Central of New Jersey from mines in the Wyoming region which embraces Scranton. Of the anthracite regions the Wyoming region is the most distant from the Atlantic seaboard. The assailed joint rates are generally 12 or 13 cents higher than these single-line rates of the Central of New Jersey."

The report of the full Commission on reconsideration sustained this specific finding of Division 4, and in it we concur. We also find that the Von Storch Colliery and the eleven mines supplying coal to it are in the Wyoming region.

Now, the difficulty of Penn Anthracite is a very practical one. If it does not make use of the Ontario & Western to ship coal from the Von Storch Colliery after its cleansing and sizing processes are completed, it cannot avail itself of the low, inbound, run of the mine rate heretofore referred to to get the coal from the mines into the colliery. If, on the other hand, it avails itself of the Ontario & Western to take its coal when cleansed and sized from the colliery to destinations in tidewater New Jersey, it must make use of the combination rate heretofore referred to, which is prohibitive from the ordinary commercial point of view. Faced with this difficulty, it appealed to the Interstate Commerce Commission, which made the order referred to in the first paragraph of this opinion.

Briefly, the Commission found that the through route over the Ontario & Western and the Central of New Jersey was already in existence from the Von Storch Colliery to New Jersey tidewater points and that the through rates composed of the local and

proportional rates heretofore referred to are available for the transportation of coal over it. The Commission also found that it had the power, pursuant to the ruling of the Supreme Court in Virginian Ry. Co. v. United States et al., 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463, to find the combination rate unlawful under sections 1 and 3 of the Interstate Commerce Act (49 U.S.C.A. §§ 1, 3) without any special finding of public interest essential to establishing through routes and joint rates under section 15 (3) of the act (49 U.S.C.A. § 15(3).

It is the contention of the Delaware & Hudson that the Commission had no power to order Central of New Jersey and the Ontario & Western to maintain combination rates not to exceed corresponding single-line rates for like sizes of anthracite, in carloads, as maintained by the Central of New Jersey from mines on its lines in the Wyoming region because the Central of New Jersey has no trackage over an essential part of the route, to wit, from Minooka Junction to Union Junction, such trackage being owned and operated by the Delaware & Hudson, and being made available to the Central of New Jersey only by virtue of a 999-year trackage agreement entered into on January 27, 1887, by the predecessors in interest of the Delaware & Hudson and the Central of New Jersey. It is the contention of the Delaware & Hudson that this trackage agreement prohibits the use of the trackage from Minooka Junction to Union Junction for freight having its origin "at points north of Scranton on the Delaware Company's lines or on the connecting lines forming the extensions thereof." The Delaware & Hudson further contends that the Von Storch Colliery within the meaning of the trackage agreement is at a point "north of Scranton," and that the Commission by making the order referred to deprives the Delaware & Hudson of two rights guaranteed to it by the trackage agreement, to wit, a right of arbitration with the Central of New Jersey and a right to terminate the agreement should the Central of New Jersey be guilty of "wilful" breach of its provisions. In respect to this last point it points out that, if the Central of New Jersey makes use of the disputed trackage under an order of the Interstate Commerce Commission, it can certainly not be held to be guilty of "wilful" breach of the agreement.

Certain preliminary questions must be disposed of. It is the contention of the United States and the interveners that the Delaware & Hudson has an adequate remedy at law. We cannot sustain this contention. It is true that in our opinion as hereinafter expressed the order of the Commissioner makes no change in the status of the relationship of the Delaware & Hudson and Central of New Jersey so far as the use of the particular trackage involved is concerned, and that therefore the plaintiff has no good cause of action. None the less, the cause of action itself is cognizable only in a court of equity and not at law, since the relief which the plaintiff seeks is an injunction against a continuing trespass of Central of New Jersey upon the plaintiff's trackage. The plaintiff, on the other hand, contends that the Commission has no power to construe the trackage agreement of 1887 in any respect in which such construction is at variance with the interpretation of the parties to the agreement. We have carefully examined the authorities cited by the plaintiff for this proposition and we believe that they do not support the contention advanced. The trackage agreement was brought into the case by the Delaware & Hudson in the action of Penn Anthracite Company before the Commission and as a bar to the relief sought by Penn Anthracite. It was therefore necessary for the Commission to construe the meaning of the phrase "points north of Scranton" occurring in the trackage agreement. The Commission of necessity had to construe this phrase precisely. This court must also construe it, and the meaning to be put upon the phrase in question must be gathered, not only from the instrument as a whole, but also from all attendant circumstances. Further, it does not appear from the record that any construction has been placed upon this phrase by both parties to the agreement or their successors in right.

The plaintiff contends that the phrase "points north of Scranton" means in fact points north of the northern terminus of the old Union Railroad. To reach this conclusion the plaintiff makes an ingenious argument based chiefly upon the following:

The Union Coal Company (then independent, but at the time of the agreement of 1887 already acquired by the Delaware and Hudson) by a contract executed in 1866 with Lehigh Coal & Navigation Company, the predecessor in right of the Central of New Jersey, gave to the Lehigh Company a right of trackage of its entire railroad. This

railroad, called the Union Railroad, ran from Union Junction to a northern terminus which in 1866 was the point of connection with the old Valley Railroad, owned by the Delaware & Hudson Canal Company, the predecessor in right to the Delaware & Hudson. This northern point of connection was in the city of Scranton. But, proceeds the. plaintiff's argument, since the first paragraph of the preamble of the 1887 agreement states that the Union Railroad "has furnished the connection between Union Junction * * * and Scranton," it necessarily follows that the word "Scranton" means the terminus of the Union Railroad in Scranton, to wit, the point of connection of the Union Railroad with the old Valley Railroad. The plaintiff contends that only by this construction can it be protected within the fair meaning of the 1887 agreement from the use of its own tracks for competitive traffic originating within the city of Scranton, north of the terminus of the old Union Railroad and by extensions and connections of the lines of the Central Railroad of New Jersey beyond that point.

In furtherance of its contention the plaintiff refers to the provisions of the second paragraph of the agreement which sets up prohibitions placed upon the Lehigh Company from securing business by means of. lateral or auxiliary tracks connecting with the Lackawanna & Bloomsburgh Railroad and the Spring Brook Railroad. The plaintiff also contends that the requirement in the third paragraph of the agreement that the "Delaware Company's locomotives" shall be use at a prescribed rate for freight hauled over the Union Railroad makes it plain that the Delaware & Hudson Canal Company desired to preserve the integrity of its traffic over the Union Railroad, particularly its traffic originating north of the northern terminus of the Union Railroad. The plaintiff contends that its position in this respect is further strengthened by the undisputed facts that the Ontario & Western's line did not reach Scranton and connect with the Central of New Jersey until 1890, and that the Ontario & Western's line did not reach the Von Storch Colliery until 1931. The plaintiff then argues that to permit the Central of New Jersey to compete with the Delaware & Hudson for traffic to pass south over the Union Railroad to New Jersey tidewater points would be to short haul the Delaware & Hudson by its own trackage. Other and further reasons are urged by the plaintiff in support of its argument, and we have considered these as well as the foregoing.

■ None the less we are forced to the conclusion that at the time of the execution of the 1887 agreement the parties thereto had clearly in mind the probability of extensions of their respective railroads beyond the geographical limits of the city of Scranton and of traffic being made available therefrom to them by both existing and proposed connections in Scranton. The Delaware & Hudson Canal Company certainly contemplated substantial future traffic originating by means of its connecting lines and extensions north of Scranton. It is our conclusion, as it was the Commission's, that it was this traffic which the Canal Company desired to protect from future competition on the part of the Lehigh Company. In fact, the Von Storch Colliery and its two coal mines were on the line of the Canal Company alone and no competition in respect to the hauling of coal from the Colliery reasonably could have been anticipated. Such competition did not arise until over forty years later, when the nine new mines upon the line of the Ontario & Western were purchased by the Penn Anthracite Company and the Ontario & Western built its connection to the Von Storch Colliery. We do not believe that the restrictive covenants of the 1887 agreement were to protect from competition arising that far in the future and under such circumstances. Virginian Ry. Co. v. United States, supra;, United States v. Erie Railroad Co. et al., 280 U.S. 98, 102, 50 S.Ct. 51, 53, 74 L.Ed. 187; Mills v. Lehigh Valley Railroad Co., 238 U.S. 473, 480, 481, 35 S. Ct. 888, 59 L.Ed. 1414. To put the meaning contended for by the plaintiff upon the phrase "points north of Scranton" in our opinion is to do violence to plain language.

■ We think that there was substantial evidence before the Commission to support its findings and that these findings were within the statutory authority of the Commission. They therefore will not be disturbed by this court.

■ It is the contention of the United States and the interveners that the plaintiff has no standing to bring this suit. In determining this question of law my colleagues and I are not in accord. They hold that the plaintiff has a legal right or interest which will be affected injuriously within the terms of section 45a of the Judicial Code by the

order of the Commission, 28 U.S.C.A. § 45a, and I hold to the contrary. See Moffat Tunnel League v. United States, 289 U.S. 113, 53 S.Ct. 543, 77 L.Ed. 1069; Edward Hines Yellow Pine Trustees v. United States, 263 U.S. 143, 44 S.Ct. 72, 68 L.Ed. 216; Sprunt & Sons, Inc., v. United States, 281 U.S. 249, 50 S.Ct. 315, 74 L.Ed. 832. In view of the fact that we have decided the case upon other issues, this difference of opinion between members of the court has but small importance.

The petition must therefore be dismissed.