**NATIONAL MOTOR FREIGHT TRAFFIC ASSOCIATION, INC., et al., Plaintiffs,**

v.

**UNITED STATES of America et al., Defendants.**

Civ. A. No. 1694–60.

United States District Court

District of Columbia.

May 10, 1962.

Bryce Rea, Jr., Washington, D. C., for plaintiffs.

Joel Hoffman, Atty., Dept. of Justice, for defendant United States.

Fritz R. Kahn, Atty., Interstate Commerce Commission, for defendant Interstate Commerce Commission.

James L. Givan, Washington, D. C., D. Robert Thomas, Chicago, Ill., for intervenors.

Before BURGER, Circuit Judge, and MATTHEWS and WALSH, District Judges.

BURGER, Circuit Judge.

Plaintiffs seek to set aside and annul a decision of the Interstate Commerce Com-

mission [1] approving a tariff published by the Western Freight Association, a freight forwarder, in which reduced rates were set out for freight shipments of 20,000–30,000 pounds moving from the area called Official Territory (generally the territory East of the Mississippi River and North of the Ohio and Potomac Rivers) to points on the Pacific Coast. Plaintiffs, all motor carrier associations whose members are individual carriers engaged in interstate commerce, attack the tariff as unlawful insofar as under its terms freight forwarders need not perform certain specific freight forwarding duties which the plaintiffs urge are required by § 402(a) of the Interstate Commerce Act. 56 Stat. 284 (1942), 49 U.S.C.A. § 1002(a) (5). It is argued that the freight forwarders under this tariff thus illegally enter into destructive competition with the motor carrier industry contrary to established national transportation policy. The Western Freight Association and nine [2] other freight forwarders with similar vital interests have intervened.

The Government vigorously argues that the plaintiffs lack standing to sue as they are simply associations of carriers rather than carriers and hence will not be affected by the challenged order of the Commission. Plaintiffs point out that they are incorporated organizations engaged in many official services for the individual carriers comprising their membership, including, *inter alia*, frequent appearances before the Interstate Commerce Commission on behalf of members.

However, the claims made by plaintiffs regarding the multiple services they undertake for members are not relevant to the question of standing to sue in this court. Nor is standing in a judicial proceeding to be equated with participation in a proceeding in the Interstate Commerce Commission. An association's access to administrative agency proceedings rests on a different basis from standing to sue in this court. See Pittsburgh & W. Va. Ry. Co. v. United States, 281 U.S. 479, 50 S.Ct. 378, 74 L. Ed. 980 (1930). The essence of any litigant's qualification to sue is his susceptibility to injury in a legally cognizable sense, which, stated another way, is simply the reality of his being aggrieved by the decree or party he challenges. The law provides no remedies for imagined detriment. In this light, the fact stands out that the plaintiff associations will in no way be affected by the freight forwarder rates fixed by the challenged Commission order except in the remote sense that the problems of their members are their concern. The associations are not engaged in the business of motor transportation, nor subject to the regulatory provisions of the Interstate Commerce Act. Whatever novel competitive effects, if any, may flow from the Commission's order, it will not affect the associations but only some of their individual members; consequently it cannot be said that the associations face any but a vicarious economic threat and that only in the narrow sense that adverse economic effects on members may ultimately but indirectly cause a diminution of support or contributions for the associations. Even this remote contingency is speculative. This would be an attenuated form of general economic injury for which courts have been reluctant to give relief especially when it results from normal non-discriminatory competitive patterns. See Hines Yellow Pine Trustees v. United States, 263 U.S. 143, 44 S.Ct. 72, 68 L.Ed. 216 (1923); Alexander Sprunt & Son, Inc. v. United States, 281 U.S. 249, 50 S. Ct. 315, 74 L.Ed. 832 (1930).

---

1. Investigation and Suspension Docket No. 6993 (Eighth Supplemental Order), Forwarder Volume Commodity Rates, Transcontinental, reported at 306 I.C.C. 535 and upon reconsideration at 311 I.C.C. 773.

2. Acme Fast Freight, Inc., International Forwarding Company, Inc., Merchants Shippers Association, National Carloading Corporation, Pacific Forwarding Association, Inc., Republic Carloading & Distributing Co., Inc., Universal Carloading & Distributing Co., Inc., Western Carloading Co., Inc. and Westland Forwarding Co.

We do not find Associated Industries of New York State v. Ickes, 134 F.2d 694 (2d Cir. 1943), dismissed as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414, persuasive or applicable authority to the contrary. There the Bituminous Coal Act of 1937 accorded standing to "persons aggrieved," a category of litigant which under broad Supreme Court interpretations [3] included *anyone* threatened with economic adversity. A "person aggrieved," as the Ickes case pointed out, "need not show that he has such a 'standing' as is *ordinarily* required in injunction suits to restrain actions by officials alleged to be unlawful * * *." 134 F.2d at 702. (Emphasis added.) The present plaintiffs have brought an injunction suit against the United States, and the requirements of standing which "ordinarily apply" are the requirements to be met. See Utah Citizens Rate Ass'n v. United States, D.C., 192 F.Supp. 12 (1960). Neither Eastern Express, Inc. v. United States, D.C., 198 F.Supp. 256 (1961), aff'd, 369 U.S. 37, 82 S.Ct. 640, 7 L.Ed.2d 548 (1962), nor American Trucking Ass'ns v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960), bar this conclusion, since in both cases the plaintiffs were comprised of individual carriers as well as membership associations, and where one party thus has standing to sue, as did the individual carriers there, it is immaterial under the liberal intervention statute, 28 U.S.C. § 2323, that the remaining association plaintiffs might not have had standing to originally bring suit. See Arrow Transp. Co. v. United States, 176 F.Supp. 411 (D.C.Ala.1959), aff'd., 361 U.S. 353, 80 S.Ct. 406, 4 L.Ed.2d 362 (1960).

Assuming, arguendo, we are in error on the issue of standing,[4] the importance of the case suggests the desirability of considering the merits so that the parties will have our views on the substantive as well as the jurisdictional issue, for whatever that may be worth.

Section 402(a) (5) of the Interstate Commerce Act, 49 U.S.C.A. § 1002(a) (5) describes a freight forwarder as

"any person which * * * (other than a motor, rail or water carrier subject to Part I, II or III of the Act) holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for * * * transportation of such shipments, the services of a (motor, rail or water) carrier or carriers subject to part I, II, or III of this Act."

In essence, the freight forwarder is the intermediary between shippers with a typically small consignment (300–400 pounds,) and the carriers who transship the goods by rail, motor or water to the consignee. Ordinarily a single shipper cannot assemble a shipment sizable enough to fully load a boxcar or truck, and must thus pay higher less-than-car or truckload rates for carriage. The freight forwarder, however, by consolidating consignments of different goods from multiple shippers at a single terminal is enabled to fill entire trucks or boxcars, usually with up to 60,000 pound capacities, and thereby obtains commensurately lower rates from the carrier,

3. See Federal Communications Commission v. Sanders Bros. Radio Station, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869 (1940) ; Scripps-Howard Radio, Inc. v. Federal Communications Commission, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942).

4. For excellent contrasting studies which depict the complexity of problems of standing, see Jaffe, Standing to Secure Judicial Review: Private Actions, 75 Harv.L.Rev. 255 (1961) and Davis, Standing to Challenge Governmental Action, 39 Minn.L.Rev. 353, 369 (1955).

thus effecting a substantial saving from which he is paid. The individual shipper will conventionally pay the freight forwarder nearly the same rate he would pay the common carrier, but through the freight forwarder's handling is afforded the added benefits of expedited service (1) because of the forwarder's freedom to specify the routing of consolidated shipments and (2) because of the absence of delays while economically transportable quantities accumulate with the carrier. The forwarder's profit stems from the difference between the amount it is charged for the mass shipment by the carrier and the amount it charges the individual shippers whose several consignments comprise the consolidated load. See Chicago, Milwaukee, St. Paul & Pac. R. Co. v. Acme Fast Freight, Inc., 336 U.S. 465, 69 S.Ct. 692, 93 L.Ed. 817 (1949).

As plaintiffs urge, it is quite true that the forwarders usually and in the ordinary course of their undertaking perform or provide for the performance of certain reasonably distinct functions: a forwarder ordinarily (1) *assembles* the several different shipments at its terminal by having them brought in from the various consignor premises, usually by motor carrier; (2) it *consolidates* the shipments into a proportion qualifying for the reduced carrier rate and in this form sees to their safe transport to destination; (3) it *"breaks bulk"* at the destination point by restoring each shipper's merchandise in units for delivery to the consignee; and (4) *distributes* the separated shipments or arranges for their distribution, again usually by motor carrier, to the premises of the various consignees not located in the destination terminal.

The challenged tariff contemplates certain variations from these ordinary procedures when a shipper desires transportation for 20,000–30,000 pound loads, and it offers the shipper a reduced charge contingent upon what degree of variation occurs. Thus where a shipper delivers his own freight to the forwarder's loading facility or where he arranges to have the consignee pick up the freight at the carrier's destination terminal, or both, the freight charge will be correspondingly lower. The reduced rate, as suggested, flows from performing less service.

These variations by which consignors or consignees engage in certain operations normally administered by motor carriers under contract with the freight forwarder constitute the gravamen of the motor carrier's complaint. Complaint is additionally lodged against the practice by which consignor-shippers of 20,000–30,000 pounds under this tariff will receive an empty boxcar on a siding on their own premises and load it without the freight forwarder's assistance. Under current rules promulgated by the railroads for their own convenience, specifically the "marriage" rule and the "three for one" rule,[5] such a car may conceivably never pass through a consolidation or deconsolidation process at a freight forwarder terminal point, either of origin or destination, but will be directly delivered in its partially loaded form to the consignee's siding, in which case the freight forwarder will have never handled or seen the shipment, and consequently will not have performed, in the literal sense, all the steps outlined for freight forwarding operations by § 402 (a) (5). The forwarder's service in such

5. The Commission below described these rules as follows:

To facilitate the return of refrigerator cars to the west coast and with payloads, the transcontinental rail lines publish rules reserving the right to tender two or three such cars in lieu of an ordered boxcar, depending upon the size of the latter. They also publish so-called "marriage" rules under which, instead of

stopping in transit a partially loaded car for completed loading, they may tender another car, the billing nevertheless showing the handling originally desired by the party tendering the traffic and thus "marrying" the two cars with partial loads.

In either case, then, the shipment is fictionally viewed as having been made by only one fully loaded car, and the rate charged reflects this.

case is limited to making shipping arrangements such as selection of carrier, routing, etc.

The plaintiff Associations' objections to these operations cannot be upheld. With regard to instances where a consignor partially loads a boxcar himself and direct shipment thereafter prevents normal consolidation operations by the freight forwarder, who has no contact with the car whatever, we find nothing in the act which commands otherwise, nor do we observe that the national transportation is contravened by the practice. This practice, it is to be remembered, results from the operation of railroad and not freight forwarder rules, and moreover will be the exceptional and not the usual procedure. Normally[6] such a car, partially loaded with the 20,-000–30,000 pounds to which the challenged rate is applicable, will roll to a freight forwarder concentration point for consolidation with other shipments "to approximate as nearly as practicable the average of 60,000 pounds which the respondent's experience indicates can be loaded in one car of mixed shipments." 311 I.C.C. 775. Indeed, profit for the freight forwarder lies precisely in the utility of such consolidation. Thus *only* when *convenience for the railroads* requires that the "marriage" or "three for one" rules be invoked, whereby constructive consolidation occurs, can the freight forwarder *not* proceed with actual consolidation and still hope for a profit. It is clear that the occasional departure from this norm of actual consolidation and distribution is not so seriously nor so frequently at variance with the literal language of the Act as to outweigh the benefit to the shipping public which the operation of the 20,000–30,000 pound tariff viewed as a whole will afford.

6. Distinguishable in this respect are the Commission decisions in Class Rates, Official Territory to Corpus Christi, 303 I.C.C. 293 (1958) and Radio & Television Sets, 302 I.C.C. 654 (1958), relied upon by plaintiff, in which the rates in issue did not require the freight forwarder to perform in the ordinary course of business both assembly and consolidation, as well as breakbulk and distribution.

Secondly, in our view defendants will continue to hold themselves out as freight forwarders within the terms of the Act under this reduced rate schedule even though in a precise sense they may not break-bulk or distribute to beyond destination terminal points if the consignees desire to do their own unloading and delivery as the schedule permits. Plaintiffs seek in effect to deny consignees access to freight forwarder service altogether in those instances when a consignor prefers to make delivery and a consignee considers it prudent or profitable to undertake such unloading and delivery operations himself. This might well be the case where particularly fragile or delicate goods are involved, or when the consignor or consignee considers himself otherwise better equipped to carry on those particular jobs. At the same time plaintiffs do not suggest that there is a method alternative to freight forwarding whereby large less-than-carload shippers can obtain the same advantages from ordinary interstate carriers. Nor are we referred to cases which have so narrowly confined freight forwarders to actual physical unloading and delivery, as plaintiffs would have us do.[7]

No reason appears to require a view that the break-bulk and distribution operations are always distinct, always occur in a certain order, and may never be consummated coincidentally or concurrently. We think it within the purview of statutory policy to consider that the freight forwarder has appropriately performed whatever his break-bulk and distribution functions may be when he has made a shipment available to a consignee at the destination terminal and, at consignee's option and request, relinquished control over the shipment to the consignee to do with it as the latter sees fit under the contract.

7. Cf. Dinion Coil Co. v. International Forwarding Co., 304 I.C.C. 1, 3 (1958), where the Commission did *not* think that "to retain its freight forwarder status under the act [a forwarder] must assemble and consolidate, and break bulk and distribute as to every shipment handled by it. To so hold would disregard the provision in section 402(a) (5): 'in the ordinary and usual course of its undertaking.'"

That aspect of the national transportation policy which seeks to promote more efficient service is clearly well served by the operations which may be undertaken under the freight forwarder rate schedule which the Commission has here approved. As the Commission said, "If a forwarder can handle a heavier weighted shipment more economically than it can handle several small shipments of the same aggregate weight, the shipping public should receive the benefits flowing from that fact." 311 I.C.C. 775. On the other hand, no destructive competitive effects appear of a proportion to offset the benefits of this improvement.

■ ■ The essence of plaintiffs' case is that a forwarder *must* actually perform all the functions he is *authorized* to perform, i. e., (1) assemble, (2) consolidate, (3) break-bulk and (4) distribute the consignor's freight. Failing to do *all four* steps, plaintiffs claim, one cannot hold out as a forwarder. The forwarders proffer these services but that is the extent of their obligation under the certificate. If some consignors or consignees wish to have less than the proffered service no statute and no public policy prevent such arrangements being authorized by the Commission. The order of the Commission should not be disturbed, and the complaint is therefore dismissed.