KANSAS CITY POWER & LIGHT COMPANY et al., Appellants,

v.

Douglas McKAY, Secretary of the Interior, et al., Appellees.

No. 12067.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 4, 1954.

Decided April 28, 1955.

Petition for Rehearing Denied June 3, 1955.

Certiorari Denied Nov. 7, 1955. See 76 S.Ct. 137.

See, also, 12 F.R.D. 408.

Mr. Raymond T. Jackson, Cleveland, Ohio, of the bar of the Supreme Court of Ohio, pro hac vice, by special leave of Court, and Mr. Richard L. Arnold, Texarkana, Ark., with whom Messrs. E. Fontaine Broun and Henry T. Rathbun, Washington, D. C., were on the brief, for appellants.

Mr. Morton Liftin, of the bar of the Supreme Court of New York, pro hac vice, by special leave of Court, with whom Messrs. Leo A. Rover, U. S. Atty., Paul A. Sweeney, Atty., Dept. of Justice, and Theodore H. Haas, Atty., Dept. of the Interior, were on the brief, for appellees. Messrs. Lewis A. Carroll and Samuel L'Hommedieu, Jr., Asst. U. S. Attys., entered appearances for appellees.

Mr. William C. Wise, Washington, D. C., filed a brief on behalf of N. W. Electric Power Cooperative, Inc., et al., as amici curiae, urging affirmance.

Before PRETTYMAN, BAZELON and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This case involves the question whether utility companies which claim they are in competition with a federally-supported power program can obtain the aid of the courts in challenging the validity of that program.

Plaintiffs-appellants, electric utility companies operating in Kansas, Missouri and Arkansas, ask for relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, against the Secretaries of the Interior, Agriculture and the Treasury and the Administrators of the Southwestern Power Administration ("SPA") and of the Rural Electrification Administration ("REA") as defendants: (1) enjoining them from lending or disbursing funds of the United States to SPA or to certain federated power cooperatives for the construction by the latter of electric generating and transmission facilities and for the sale and purchase of electric power to and from them by SPA; (2) enjoining them from doing anything in furtherance of an alleged plan by which SPA would in effect construct and acquire control of these generating and transmission facilities contrary to law; and (3) declaring that they have no right, power or authority to carry out the alleged plan.

Defendants moved to dismiss the complaint for the reason, among others, that plaintiffs did not have the capacity and did not show any injury or interest entitling them, to maintain the suit. The District Court denied the motion to dismiss on the ground that the instant case does not fall within the rule of Alabama Power Co. v. Ickes, 1938, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374. Thereafter, upon trial of the issue of the legality of the loan contracts and lease agreements entered into by the defendants, the District Court held, 115 F.Supp. 402, that those contracts and agreements were valid and authorized by the Rural Electrification Act and the Flood Control Act of 1944, respectively. From the final judgment for the defendants the plaintiffs, other than Missouri Edison Company, have appealed.

Defendants SPA and REA have made contracts with five federated cooperatives,[1] including Northwest Electric Power Cooperative, Inc. ("Northwest"). The contracts with Northwest, which are sub-

---

[1] Northwest Electric Power Cooperative, Inc. ("Northwest"); KAMO Electric Cooperative, Inc. ("KAMO"); Central Electric Power Cooperative ("Central"); Sho-me Power Corporation ("Sho-me"); and M. & A. Electric Power Cooperative ("M. & A.").

stantially the same as the contracts with the others, will be summarized. The Government, acting through REA, for "the purpose of furnishing electric energy to persons not receiving central station electric service" has agreed to lend Northwest money for the construction of an electric generating plant and transmission lines, substations, transformers and related facilities in certain described rural areas. Northwest is obligated to repay the loan within 35 years, which the revenue derived from the sale of the newly-created power output will enable it to do. Under a separate agreement with SPA, Northwest is to construct a transmission line from the Government-owned Bull Shoals Reservoir in Arkansas to the proposed generating plant, and is to lease the line to SPA for a period of 40 years, with an option to purchase. Northwest also agrees to sell to SPA the power output of the new generating plant and SPA in turn will supply Northwest at a single delivery point with its power requirements. In case SPA cannot furnish all the power needed by Northwest, the latter may buy additional power from any available source.

Plaintiffs are electric power utilities, supplying electric service to a large number of customers in Missouri, Kansas and Arkansas, including rural electric distribution cooperatives to whom central station service is rendered. None of them has exclusive franchises to supply electric power. They have programs, in various stages of planning or execution, to expand their facilities to meet estimated increases in demand for electric energy from all of these consumers and customers. They claim that the contractual arrangements made by REA and SPA with the federated cooperatives will thwart their plans and duplicate their facilities (existing, under construction, or authorized), which are or will be available to serve the federated cooperatives' demand for central station service. They contend that the contracts violate the loan standards of the Rural Electrification Act of 1936;[2] that SPA's power rates are uneconomical, and that the congressionally-imposed restrictions on SPA's activities have been violated, contrary to the provisions of the Flood Control Act of 1944;[3] that the contracts enable the federated cooperatives to engage in destructive federally-subsidized competition with plaintiffs; and that the defendants (other than the Secretary of the Treasury) are misusing the lending powers of REA to obtain for SPA control or ownership of the large steam generating plants and transmission lines built by the federated cooperatives, contrary to the intent of Congress, the Constitution and the laws above referred to.

2. Under the Rural Electrification Act, 7 U.S.C.A. § 901 et seq., the Administrator of the REA is empowered to make loans to cooperative associations for the purpose of "financing the construction and operation of generating plants, electric transmission and distribution lines or systems for the furnishing of electric energy to persons in rural areas who are not receiving central station service". 7 U.S.C.A. § 904. Such loans may not extend beyond 35 years and carry interest at 2 per cent. 7 U.S.C.A. §§ 903(a), 904.

3. This Act, 33 U.S.C.A. § 701–1 et seq., 16 U.S.C.A. § 825s et seq., authorizes the Secretary of the Army to engage in flood control work and to improve navigation through reservoir or other projects. Section 5, 16 U.S.C.A. § 825s, directs that electric energy and power generated at reservoir projects under Army control and not required in their operation shall be delivered to the Secretary of the Interior for transmission and disposal "in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles, the rate schedules to become effective upon confirmation and approval by the Federal Power Commission." To effectuate such sales the Secretary of the Interior is authorized to construct, or acquire with funds appropriated by Congress, transmission lines and related facilities needed to make the power generated at the reservoirs available in wholesale quantities to various classes of purchasers including public bodies and cooperatives. The proceeds from the sales of such energy are to be paid into the general fund of the Treasury.

■ It is indisputable that the essence of plaintiffs' complaint is the competition which they will suffer if the Government's contracts are carried out. They can claim no other interest or injury. The defendants have not undertaken to regulate them in any way. They have not been ordered to abandon any of their activities or to forego the expansion programs planned by them. They have not been subjected to any obligation or duty. Their sole interest and objective is to eliminate the competition which they fear. Controlling decisions of the Supreme Court, dealing with other electric power contracts of the Federal Government, establish that an interest of this kind is not sufficient to enable them to sue to enjoin execution of the power contracts and program of the Government. See Alabama Power Co. v. Ickes, 1938, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374; Duke Power Co. v. Greenwood County, 1938, 302 U.S. 485, 58 S. Ct. 306, 82 L.Ed. 381; Tennessee Electric Power Co. v. T. V. A., 1939, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543.

In the Alabama Power case, suit was brought to enjoin the execution of contracts for the lending and grant of money to certain cities for the construction of municipal electric distribution systems, on the ground in part that the contracts were not authorized by statute. It was contended that such contracts would establish rival and competing plants resulting in loss of business to the plaintiff. The Supreme Court, affirming this court, took the view that the power company was without standing to challenge the validity of the contracts by suit. The Court stated:

"The only pertinent inquiry, then, is, what enforceable legal right of petitioner do the alleged wrongful agreements invade or threaten? If conspiracy or fraud or malice or coercion were involved, a different case would be presented, but in their absence, plainly enough, the *mere* consummation of the loans and grants will not constitute an actionable wrong. Nor will the subsequent application by the municipalities of the moneys derived therefrom give rise to an actionable wrong, since such application, being lawful, will invade no legal right of petitioner. The claim that petitioner will be injured, perhaps ruined, by the competition of the municipalities brought about by the use of the moneys, therefore, presents a clear case of *damnum absque injuria*. Stated in other words, these municipalities have the right under state law to engage in the business in competition with petitioner, since it has been given no exclusive franchise. If its business be curtailed or destroyed by the operations of the municipalities, it will be by lawful competition from which no legal wrong results." 302 U.S. at pages 479–480, 58 S.Ct. at page 303.

The Court further made it clear that one whose only injury will result from lawful competition has no standing to question whether the contracts with the municipalities were authorized by statute and thus legal. It said:

"Can any one who will suffer injurious consequences from the lawful use of money about to be unlawfully loaned maintain a suit to enjoin the loan? An affirmative answer would produce novel and startling results. * * * Considered apart, the lender owes the sufferer no enforceable duty to refrain from making the unauthorized loan; and the borrower owes him no obligation to refrain from using the proceeds in any lawful way the borrower may choose." 302 U.S. at page 480, 58 S.Ct. at page 304.

■ Appellants undertake to escape the impact of this case on three grounds. First, they say, as did the District Court, that in the Alabama case the competition was lawful, whereas here it is unlawful, since none of the defendants, all Federal officers and agencies, have any franchise

to supply electric power to the public from the States involved.[4] But Tennessee Electric Power Co. v. T. V. A., supra, which followed the Alabama case, shows that any competition which may result from the contractual arrangements of the Federal agencies here cannot be regarded as unlawful. In that case various public utility companies which generated, distributed, and sold electricity in the States within the TVA area sued to enjoin the Authority from generating, distributing, and selling electric power in duplication of, or competition with, any of their services. The Supreme Court denied their capacity to maintain the suit on the reasoning employed in the Alabama Power opinion. 306 U.S. 139–140, 59 S.Ct. 370.[5] It rejected the contention that the competition which the Authority's program would provide was illegal, pointing out that the charters and franchises awarded to the public utility companies did not "involve the grant of a monopoly or render competition illegal." 306 U.S. at page 139, 59 S.Ct. at page 370.[6] So here, appellants point to no provision in their charters which purports to grant them a monopoly or to protect them from competition by a Federal instrumentality, with the result that they have no basis for asserting that the competition which will be provided by SPA's activities is illegal as to them. This is not to say, of course, that even if the franchises granted by the States had contained provisions purporting to protect the power companies from Federal competition, it would have any effect as against the Federal Government.

■ Second, appellants attempt to differentiate their case from the Alabama Power and the Tennessee Power cases on the ground that here they have alleged an unlawful conspiracy against them by the defendant Government officials and agencies. They summarize their claim of conspiracy as one of concerted action among the appellees to injure their businesses by unlawful means, i. e., by violations of the Rural Electrification Act and the Flood Control Act. It is contended that in neither the Alabama nor the Tennessee case was the conspiracy which was alleged based on violations of statutes.

In the Alabama case, however, as our opinion states, 67 App.D.C. 230, at page 231, 91 F.2d 303, a conspiracy was alleged, based in part on the claim that the actions there were unconstitutional, that is, violated the Federal Constitution. The District Court found that no conspiracy existed. Both this court and the Supreme Court held that the plaintiffs had no standing to sue and dismissed the complaint. It is true that the Supreme Court stated that, if "conspiracy" were involved, a different case would

---

4. There is no contention that the federated cooperatives do not possess franchises to generate, distribute, and sell electric power.

5. "The appellants further argue that even if invasion of their franchise rights does not give them standing, they may, by suit, challenge the constitutionality of the statutory grant of power the exercise of which results in competition. This is but to say that if the commodity used by a competitor was not lawfully obtained by it the corporation with which it competes may render it liable in damages or enjoin it from further competition because of the illegal derivation of that which it sells. If the thesis were sound, appellants could enjoin a competing corporation or agency on the ground that its injurious competition is *ultra vires*, that there is a defect in the grant of

powers to it, or that the means of competition were acquired by some violation of the Constitution. The contention is foreclosed by prior decisions that the damage consequent on competition, otherwise lawful, is in such circumstances *damnum absque injuria*, and will not support a cause of action or a right to sue."

6. Although some of the individual States had exempted Federal agencies from the jurisdiction of their public utilities commissions, the opinion of the Supreme Court obviously did not turn on this. Indeed, the Court said: "The Authority's action in these states is consonant with state law, but, as has been shown, if the fact were otherwise, the appellants would have no standing to restrain its continuance." 306 U.S. at page 142, 59 S.Ct. at page 372.

be presented, 302 U.S. at page 479, 58 S.Ct. 304, but in view of the allegations of the complaint in that case, its view must have been that the charge of conspiracy as there stated gave no standing to sue. Certainly here then, where the charge of conspiracy is hinged, as appellants state, on the doing of acts allegedly in violation of statutes, the result must be the same.

In the Tennessee Power case there were allegations of conspiracy between the Public Works Administrator (acting under the PWA statute) and TVA officials (acting under the TVA statute, alleged to be unconstitutional) to injure appellants' business. The District Court made findings negativing these allegations. The Supreme Court accepted these findings, and indicated that concerted action and cooperation between Federal officials, acting under different acts, in establishing a power program in competition with utility companies, "does not spell conspiracy to injure their business." 306 U.S. at page 147, 59 S.Ct. at page 374. The Court's conclusion was that, notwithstanding allegations of conspiracy on the part of TVA officials to do unlawful acts in violation of the Con-

stitution, in no aspect of the case did the power companies have standing to maintain the suit. The inevitable conclusion here then must be that conspiracy allegations of the type made here—based on allegedly unlawful acts in violation of statutes—do not establish a right to sue.[7]

■ Third, appellants seek to distinguish the Alabama and Tennessee cases on the ground that the plaintiffs in those cases did not claim a right to maintain the action under the statutes involved, whereas in this case they do claim a right to sue under the REA and the Flood Control Act. But we think these acts do not support their claim.

■ Neither the Rural Electrification Act, the Flood Control Act of 1944 nor the "continuing fund"[8] and other appropriation acts referred to in these proceedings provides for judicial, or indeed even administrative, review of action taken by the respective agencies.[9] These statutes differ sharply from the Transportation Act, 1920, which specifically authorized suits for injunction by any "party in interest". 49 U.S.C.A. § 647. Thus cases arising under that statute, such as Singer & Sons v. Union Pacific

---

7. In the case before us, the District Court has made no specific finding that the defendants have not been guilty of conspiracy. But it did find that the contracts made by them are valid and authorized by the statutes, thus removing the only basis for the charge of conspiracy urged by appellants. If we may consider the findings of the District Court in connection with our consideration of appellants' capacity to sue, as the Supreme Court appears to have done in the Tennessee Power case, then plainly the allegations of conspiracy are without foundation. But we need not rely on those findings.

8. In the First Supplemental National Defense Appropriation Act, 1944, 57 Stat. 621, Congress created a continuing fund of $100,000 under the SPA Administrator, which was increased to $300,000 in 1949. The purpose of establishing this fund was "to defray emergency expenses necessary to insure continuity of electric service and continuous operation of the facilities, and to cover all costs in connection with the purchase of electric

power and energy and rentals for the use of facilities for the transmission and distribution of electric power and energy to public bodies, cooperatives, and privately owned companies". 16 U.S.C.A. § 825s–1. With the evident purpose of nailing down its control over the expenditure of this continuing fund in unmistakable terms, Congress amended the Act in 1951 to provide that "expenditures from this fund to cover such costs in connection with the purchase of electric power and energy and rentals for the use of facilities are to be made only in such amounts *as may be approved annually in appropriation Acts.*" (Italics added.) 65 Stat. 249, 16 U.S.C.A. § 825s–1.

9. We need not inquire here whether action taken by the Federal Power Commission in setting rates for the sale of power by the Secretary of the Interior under the Flood Control Act may be reviewed by the courts at the instance of any interested party. No such question is now before the court.

R. Co., 1940, 311 U.S. 295, 303–304, 61 S.Ct. 254, 85 L.Ed. 198, upon which appellants rely, have no relevance here. Nor do the statutes here create funds to which appellants have a specific right— a right not abridgeable by illegal administrative action—as had the State of Oklahoma in the road funds involved in State of Oklahoma v. United States Civil Service Commission, 1947, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794, or as the milk producers had to the fund for support payments in Stark v. Wickard, 1944, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733. The statutory scheme now before us clearly contemplates Congressional, rather than judicial, review of the governmental activities here in question, all of which are non-regulatory and which include disposal of surplus electric power turned over to the SPA by the Department of the Army. Congress has reserved for itself control over such activities through the power of making annual appropriations for the executive departments affected, and by providing specifically that the

contingent fund created by Section 5 of the Flood Control Act of 1944, 16 U.S. C.A. § 825s, may be expended only to the extent of annual appropriations for the purposes of the Act. The continuance of defendants' activities here complained of is therefore subject to review by Congress acting each year on the appropriations sought by the defendants.[10] It is not—under the controlling precedents—subject to review by this court.[11]

■ Appellants seek, finally, to base their right to bring this action on their alleged status as persons "suffering legal wrong" or "adversely affected or aggrieved" within the meaning of Section 10(a) of the Administrative Procedure Act.[12] 5 U.S.C.A. § 1009(a). But the Act does not help appellants. The text of Section 10(a) reads:

"Sec. 10. Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—

"(a) Right of review.—Any per-

---

10. See note 8, supra. Congress has granted to the Department of the Interior the funds necessary to allow SPA to proceed. E. g., Public Law 172, 83rd Cong., 1st Sess. (1953), 67 Stat. 261–262; Public Law 465, 83rd Cong., 2d Sess., 68 Stat. 361 (1954), providing funds for operation and maintenance as well as for the continuing fund under Section 5 of the Flood Control Act of 1944. In so viewing the statutory scheme we are aware that the Committees of the 82nd Congress have stated that action in appropriating funds for SPA was not intended to prejudge the validity of the SPA contracts involved nor as a congressional interpretation of applicable law. S.Rept. No. 1803, 82nd Cong., 2d Sess. (1952); H.Rept. No. 2451, 82nd Cong., 2d Sess. (1952). But our view of the legal import of the statutory scheme as a whole is not dependent on the making or denial of appropriations to SPA in any particular year.

11. Appellants contend that they are members of a special class for the benefit and protection of which the statutes in question imposed a duty on the defendant public officers to refrain from acting as they have done. But we find nothing in the statutes which creates any duty to benefit and protect public utility companies. Rather it seems plain that Congress reserved the right to supervise the activities of the agencies involved, including the protection of utility companies. Without some special provision for judicial review, we cannot disregard the long established rule that a utility company, the only interest of which is that it may suffer from the competition of a public power program, cannot enjoin the execution of that program.

12. The absence of a provision for judicial review in the relevant statutes does not ipso facto negate by implication the right to judicial review under the preclusion clause of Section 10 of the Administrative Procedure Act. Airline Dispatchers Ass'n v. National Mediation Board, 89 U.S.App.D.C. 24, 189 F.2d 685, certiorari denied, 1951, 342 U.S. 849, 72 S. Ct. 77, 96 L.Ed. 641. But preclusion of judicial review might well be implied here from the statutory scheme involved, at least as we view it, though we do not need to go that far. Cf. Chicago & Southern Air Lines v. Waterman S. S. Corp., 1948, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568; Trans World Airlines v. Civil Aeronautics Board, 2 Cir., 1950, 184 F.2d 66, certiorari denied Sparks v. Civil Aeronautics Bd., 1951, 340 U.S. 941, 71 S.Ct. 504, 95 L.Ed. 679.

son suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof."

The terms used in this section are terms of art. As the Attorney General's Manual on the Administrative Procedure Act points out: "The delicate problem of the draftsmen was to identify in general terms the persons who are entitled to judicial review. As so used, 'legal wrong' means such wrong as particular statutes and the courts have recognized as constituting grounds for judicial review. 'Adversely affected or aggrieved' has frequently been used in statutes to designate the persons who can obtain judicial review of administrative action.[7] [[7] See section 9 of the Securities Act (15 U.S.C. 77i), 'any person aggrieved'; section 402(b) (2) of the Communications Act (46 U.S.C.A. 402), 'person aggrieved or whose interests are adversely affected'; section 1006 of the Civil Aeronautics Act (49 U.S.C. 646), 'person disclosing a substantial interest in such order'.] The determination of who is 'adversely affected or aggrieved * * * within the meaning of any relevant statute' has 'been marked out largely by the gradual judicial process of inclusion and exclusion, aided at times by the courts' judgment as to the probable legislative intent derived from the spirit of the statutory scheme'. Final Report, p. 83; see also pp. 84–85. The Attorney General advised the Senate Committee on the Judiciary of his understanding that section 10(a) was a restatement of existing law. More specifically he indicated his understanding that section 10(a) preserved the rules developed by the courts in such cases as Alabama Power Co. v. Ickes, 1938, 302 U.S. 464 [58 S.Ct. 300, 82 L.Ed. 374]; Commonwealth of Massachusetts v. Mellon, 1923, 262 U.S. 447 [43 S.Ct. 597, 67 L.Ed. 1078]; Chicago Junction Case, 1924, 264 U.S. 258 [44 S. Ct. 317, 68 L.Ed. 667]; Sprunt & Son v. United States, 1930, 281 U.S. 249 [50 S. Ct. 315, 74 L.Ed. 832]; Perkins v. Lukens Steel Co., 1940, 310 U.S. 113 [60 S.Ct. 869, 84 L.Ed. 1108]; and Federal Communications Commission v. Sanders Bros. Radio Station, 1940, 309 U.S. 470 [60 S. Ct. 693, 84 L.Ed. 869]. Sen.Rep. p. 44 (Sen.Doc. p. 230). This construction of section 10(a) was not questioned or contradicted in the legislative history.[8] [[8] See American Stevedores, Inc., v. Porello, 1947, 330 U.S. 446 [67 S.Ct. 847, 91 L.Ed. 1011].] Also implied is the continuing role of the courts in determining, in the context of constitutional requirements and the particular statutory pattern, who is entitled to judicial review." (p. 96)

■ Section 10(a) is for the benefit of "any person suffering legal wrong", that is, one whose legal rights have been violated. As we have seen, these plaintiffs cannot effectively make such a claim. Nor are we confronted with any relevant statute within the meaning of which the plaintiffs are "adversely affected or aggrieved." Plaintiffs-appellants cite and rely on the view expressed in American President Lines v. Federal Maritime Board, D.C.D.C.1953, 112 F.Supp. 346, at page 349, which would in effect delete from Section 10(a) the phrase "within the meaning of any relevant statute". That view cannot, of course, be accepted.

■ Section 10(b) of the Administrative Procedure Act does not help appellants.[13] The reference in that section to "any court of competent jurisdiction"

13. "Sec. 10. Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—

* * * * *

"(b) Form and Venue of Action.—The form of proceeding for judicial review shall be any special statutory review proceeding relevant to the subject matter in any court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action (including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus) in any court of competent jurisdiction. Agency action shall be subject to judicial review in civil or criminal proceedings for ju-

does not of itself establish the jurisdiction of the Federal courts over an action not otherwise cognizable by them. Section 10(b) does not render competent a court which lacks jurisdiction on any other ground. Blackmar v. Guerre, 1952, 342 U.S. 512, 72 S.Ct. 410, 96 L.Ed. 534; Almour v. Pace, 1951, 90 U.S.App. D.C. 63, 193 F.2d 699; Aktiebolaget Bofors v. United States, 1951, 90 U.S.App. D.C. 92, 194 F.2d 145.

Although we thus arrive at the conclusion that the review provisions of the Administrative Procedure Act do not provide the appellants here with standing to sue, we are mindful of the fact that "it would be a disservice to our form of government and to the administrative process itself if the courts should fail, so far as the terms of the Act warrant, to give effect to its remedial purposes where the evils it was aimed at appear." Wong Yang Sung v. McGrath, 1950, 339 U.S. 33, 41, 70 S.Ct. 445, 450, 94 L.Ed. 616.[14] The instant case does not, however, involve such evils. While in the light of the decisions of the Supreme Court we would certainly be prepared to hold in an appropriate case that one who complains of administrative action may find a remedy under the Act beyond the strict scope of judicial review recognized prior to its adoption, no judicially enforceable right of plaintiffs has been disregarded by the administrative action brought before us for review. There exists, therefore, no basis for recognizing plaintiffs' standing to bring this action under the judicial review provisions of the Administrative Procedure Act.[15]

Neither the pleadings nor the record before us suggests any other basis on which the plaintiffs would have standing to sue. Clearly, plaintiffs' interest as citizens, property owners, or franchise holders considered separately from, and not merely in aid of, their right to challenge alleged unlawful competition, confers no standing upon them to challenge defendants' actions in the courts. Merely as such, their status is no different from that of ordinary taxpayers who would not have standing to sue here. Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

Nor does this case fit the type of situation in which parties economically affected by *regulatory* action on the part of the Government have been held entitled to seek judicial relief, whether the Government has taken action specifically directed against plaintiff or whether the action taken threatens to affect plaintiff's interest adversely though not singling him out specifically. In many such cases of directory or restrictive governmental action, the courts have taken jurisdiction pursuant to specific judicial re-

dicial enforcement except to the extent that prior, adequate, and exclusive opportunity for such review is provided by law." 5 U.S.C.A. § 1009(b).

14. See also the statement of Mr. Justice Clark in Heikkila v. Barber, 1953, 345 U.S. 229, 232, 73 S.Ct. 603, 605, 97 L. Ed. 972, where he referred to the Senate and House Committee reports on the Administrative Procedure Act and added: "The spirit of these statements together with the broadly remedial purposes of the Act counsel a judicial attitude of hospitality towards the claim that § 10 greatly expanded the availability of judicial review." Cf. Frankfurter, J., dissenting: " * * * the Administrative Procedure Act should be treated as a far-reaching remedial measure, af-

fording ready access to courts for those who claim that the administrative process, once it has come to rest, has disregarded judicially enforceable rights." Id., 345 U.S. at pages 237, 238, 73 S.Ct. at page 607.

15. It may, moreover, be doubted whether the agency action here involved (consisting of the making of loans to and contracts with qualified parties, which plaintiffs are not) constitutes agency action within the meaning of Section 2(g) of the Act, 5 U.S.C.A. § 1001(g), which this court could review if plaintiffs were within the provisions of Section 10(a) of the Act. See Hearst Radio v. Federal Communications Commission, 1948, 83 U.S. App.D.C. 63, 167 F.2d 225.

view provisions in the regulatory statute,[16] under the Administrative Procedure Act,[17] or in the exercise of their general equity powers.[18] But where, as here, there is no "legislative declaration of rights," [19] no regulatory action by the Government, and no special provision for judicial review enlarging on the constitutional equity powers of the Federal courts, plaintiff can appeal only to those equity powers, and he must show more than that he is merely a person economically affected or otherwise aggrieved by some governmental activity.[20]

We conclude that appellees' motion to dismiss should have been granted. In consequence, we do not reach either the substantive or the procedural and evidentiary questions urged on us by the parties.

The judgment of the District Court will be vacated and the case will be remanded to the District Court with directions to dismiss the complaint.

It is so ordered.

PRETTYMAN, Circuit Judge (dissenting).

I disagree with my brethren in their disposition of this case.

In the complaint plaintiffs say that by mutual agreements, evidenced by written documents, certain Government officials and certain private parties, all acting in concert, plan to destroy plaintiffs' private business and property by acts which are beyond the power conferred by the Congress upon the executive officials involved and are also illegal because in violation of statutes. This court says plaintiffs had no standing to sue, they presented no justiciable controversy. With that I disagree.

The facts are tremendously complicated if described in detail, but they can be stated simply in a general outline which is sufficient for present purposes. The *dramatis personae* are, by groups, five in number:

1. A number of rural cooperative electric distribution companies. They buy electric power at wholesale and sell it at retail to farmers and others in rural areas principally in Missouri. For these purposes they own and operate distribution lines, stations, etc. Presently they buy their power from the plaintiff Companies.

2. A number of federations of the foregoing cooperatives,. which neither own nor operate any facilities but act advantageously in many matters on behalf of their respective member-cooperatives. These federations are called "Super-Coops".

3. A number of utility companies, privately owned and operated, which own and operate generating plants and transmission lines. They generate electric energy and transmit it over long high-

16. See Columbia Broadcasting System v. United States, 1942, 316 U.S. 407, 62 S. Ct. 1194, 86 L.Ed. 1563; Associated Industries v. Ickes, 2 Cir., 134 F.2d 694, reversed on other grounds, 1943, 320 U. S. 707, 64 S.Ct. 74, 88 L.Ed. 414.

17. 5 U.S.C.A. § 1001 et seq.; B. F. Goodrich Co. v. Federal Trade Commission, 1953, 93 U.S.App.D.C. 50, 208 F.2d 829.

18. Embassy Dairy v. Camalier, 1954, 93 U.S.App.D.C. 364, 211 F.2d 41; Friend v. Lee, 1955, 95 U.S.App.D.C. —, 221 F. 2d 96.

19. 211 F.2d at page 43. See, also, West Coast Exploration Co. v. McKay, 1954, 93 U.S.App.D.C. 307, 213 F.2d 582, involving an attempt to compel issuance of a patent to public lands and discussing the process (related but not analogous to the one at hand) by which the court determines when the United States is a necessary party to a suit against Government officials.

20. This distinction is well illustrated by litigation under the Bituminous Coal Act, 50 Stat. 72 (1937), 15 U.S.C. § 828 et seq. There an action brought by the City of Atlanta to enjoin fixing of coal prices failed for lack of standing to sue, City of Atlanta v. National Bituminous Coal Comm'n, D.C.D.C., 26 F.Supp. 606, affirmed, 1939, 308 U.S. 517, 60 S.Ct. 170, 84 L.Ed. 440; but a complaint against specific coal prices brought under the review provisions of Section 6(b) of the statute by private business interests claiming to be adversely affected was upheld. Associated Industries v. Ickes, supra, note 16.

voltage lines to central stations of the rural cooperatives, where they sell at wholesale. They own hundreds of miles of these transmission lines and a number of generating plants. In the complaint they say they are ready, able and willing to supply all requirements of all customers, present and potential, in these areas. We shall call them the "Companies". They are our plaintiffs.

4. The Rural Electrification Administration. This is a Government agency in the Department of Agriculture. It was created by the Rural Electrification Act[1] and has power to lend money. We shall call it the "REA".

5. The Southwestern Power Administration. This is a Government agency created under emergency war power by Executive Orders and thereunder by the Secretary of the Interior. It was authorized by statute[2] to sell the surplus energy generated at multiple-purpose reservoir projects under the control of the Department of the Army. We shall call it the "SPA".

Five sets of contracts were attacked in the complaint. Each set involved the REA, the SPA, and a Super-Coop as parties. The set used by the court as illustrative is the set to which a Super-Coop called Northwestern (or NW) is a party. This set consisted of three contracts, one a loan contract, one a lease-option contract, and the third a power contract. These contracts were integrated by reciprocal conditions, each being dependent upon execution of the others.

In brief outline what the complaint says in regard to the illustrative contracts is this: By these contracts it was agreed that REA will lend Super-Coop money to build a generating plant and certain transmission lines; Super-Coop will then do two things, lease the lines to SPA for forty years and sell to SPA the entire output of the plant for forty years; Super-Coop will then purchase from SPA all its requirements of electric energy for forty years;[3] the price to be paid Super-Coops by SPA for the output of the plant is to be the cost (principal and interest) of financing the loan to build the plant, plus operating costs assignable to the plant, and the rental for the lease of the lines is to be the cost of financing the loan to build the lines, plus operating costs assignable to the lines; and the purchase of power back from SPA by Super-Coop on behalf of its member rural distributors will be at a rate and not involved in the loan accounting.

The results of these confederated and integrated arrangements, say plaintiffs in their complaint, will be:

1. A duplication of the existing plants and transmission lines of the Companies which are presently fully serving the needs of the several rural areas involved.

2. A transfer by contract of all this rural area business from the Companies to SPA.

3. Loans from REA secured by nothing but the plants and lines to be built with the money loaned.

4. Engagement on a major scale by SPA in the ordinary utility business of generating energy, transmitting it, and selling it at wholesale.

5. The lending of money by REA specifically for the building of plants to

1. 49 Stat. 1363 (1936), as amended, 7 U.S. C.A. §§ 901–914.

2. Section 5, Flood Control Act of 1944, 58 Stat. 890, amended, 61 Stat. 501 (1947), 16 U.S.C.A. § 825s.

3. E. g., one allegation of the complaint is that the members of Northwestern would be required "to cease purchasing electric energy from their present suppliers, including plaintiffs, and to purchase all of their requirements for electric energy from Northwestern and indirectly from SPA". Other allegations are that SPA agrees to supply NW's requirements of electric energy up to 40,-000 kw; that the aggregate annual peak demand of NW members in 1949 was approximately 10,000 kw and estimated to increase to 22,000 kw by 1954; and that the capacity of the plant to be built by NW is 40,000 kw.

serve municipalities of more than 1,500 population.

While the complaint alleges the contemplated sets of contracts to be illegal in a number of respects, we need now notice only one. A principal thrust of the complaint is against concerted action, formalized by written agreement, of the Government officers and the Super-Coops. The allegation is that a number of persons—suppliers and customers—confederated to deprive plaintiffs of their business by entering into agreements whereby all the customers of plaintiffs would transfer their patronage to a potential competitor. Technically in legal terms, such an agreement and concert of action is a conspiracy.

Another concert of action described in the complaint is among the Government officers. In that respect the complaint deals with violations of the statutes conferring authority. The court considers and discusses that concert of action. But that is not the crucial allegation as to concert of action, as I read the complaint. The crucial point is the agreement between the officials and the private parties, i.e., the Super-Coops.

There are several phases to the present problem. The first phase is whether the controversy itself, as described in the complaint, is a justiciable one; this consideration is apart from the identity of the defendant parties against whom the relief is sought. A second phase is whether, if the dispute itself is justiciable, the plaintiffs are blocked by the fact that their suit is against Government officers. The court does not consider or pass upon this second phase of the problem, and I shall not do so either. Another phase is whether the Super-Coops are indispensable parties, but the court does not reach that question and I shall not.

It seems to me the allegation of damage by concerted action by the officials and the Super-Coops presents a case of damage by legal wrong. A civil action will lie upon that premise under all the rules and authorities. Disagreeing with the court, I think the plaintiffs did present a justiciable controversy, so far as the allegation of an actionable wrong is concerned. It follows that I think the court should have proceeded to consider the other point regarding justiciability, i.e., whether the suit would lie against these Government officers, and then proceed to the point as to the Super-Coops being necessary parties.

It is elementary law that an individual, whether seller or customer, can do many things by himself which he cannot do in concert with others. He can fix his own prices, select his own customers or suppliers, limit his territory, and do many things, so long as he acts alone. But the law forbids such activities by agreement. Statutes make unlawful "Every contract * * * in restraint of trade" [4] and the making of any lease or contract of sale "on the condition * * that the lessee or purchaser thereof shall not use * * * the goods * * * or * * * commodities of a competitor * * * of the lessor or seller, where the effect * * * may be to substantially lessen competition".[5] We need little citation of authority to establish the proposition that a restraint upon trade which suppresses competition and accomplishes a foreclosure of an appreciable segment of a market is illegal. A few citations will suffice.[6]

To be sure, the complaint before us does not contain an allegation of jurisdiction under the antitrust laws. But that is not our problem. Our problem is whether these plaintiffs state a case which shows them to be suffering a legal wrong, apart from the identity of the defendants.

---

4. 26 Stat. 209 (1890), 15 U.S.C.A. § 1.

5. 38 Stat. 731 (1914), 15 U.S.C.A. § 14.

6. United States v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; Standard Oil Co. of Cal. and Standard Stations v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. And see Rashid, Antitrust Aspects of Exclusive Dealing Arrangements, 40 Geo.L.J. 241 (1952); 5 Toulmin, Antitrust Laws of the United States §§ 10.25, 10.31 (1950).

If a citizen alleges that threatened conduct will invade a private, substantive, legally protected interest of the citizen, whether the interest is protected by common law or by statute, he presents a justiciable controversy.[7] And moreover, if a citizen suffers a "legal wrong" the Administrative Procedure Act makes certain and clear that he has a standing in court.[8] I think our plaintiffs show a case which gives them standing to sue. They allege not only that their business would be impaired by these contracts but that it would be wholly taken. Their right to do business is protected by statute from destruction by an agreement among customers and competitors, where the agreement amounts to unreasonable restraint of trade or of competition.

The court treats the contracts as merely setting up competition for the Companies. I do not see them that way. Allegedly these contracts would take all this business away from the Companies and give it to the Government. This would be complete destruction by concerted action, not a mere establishment of competition. And therein lies the vast difference between this situation and the T.V.A.[9] and Alabama Power [10] cases. In the T.V.A. case the problem was one of straight-out competition. The companies objected to the Government's coming into the open market to sell power in competition with private business. There was no agreement between T.V.A. and all the customers of the companies whereby the customers would stop buying the companies' power and buy all their power from the Government. The Court referred ex-pressly to the findings of the District Court that there was no concert of action. The Court also pointed out that cooperation between two Government officials, each acting under authority of a statute, does not spell conspiracy. But that is not the case at bar.

In Alabama Power Co. v. Ickes Mr. Justice Sutherland, writing for the Court with meticulous care and completeness, reserved from the decision the question we now have. The case presented a challenge to Government loans on the ground of the resultant competition to the Company. The Court cautioned in the very beginning of the discussion of the point, "If conspiracy or fraud or malice or coercion were involved a different case would be presented, but in their absence, plainly enough, the *mere* [italics Mr. Justice Sutherland's] consummation of the loans and grants will not constitute an actionable wrong." [11] And he closed the opinion by distinguishing "many other cases" on the ground that they involved "fraud, coercion, malice, conspiracy, or some other element or condition of controlling force". In the course of the opinion the Justice referred by way of illustrative example to a suppositional John Doe who operates a grocery store and objects to a loan being made to a Richard Roe who proposes to open a competing store. The lack of legal right on John's part to action against Richard is obvious. But a wholly different problem would be presented if all the customers of John agreed by contract with Richard not to buy any more groceries from John but to buy them all from Richard upon condition that Richard would build a store.

**7.** See, e. g., discussion in Associated Industries v. Ickes, 2 Cir., 1943, 134 F.2d 694, 700–701, rev'd on other grounds, 1943, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414; Duke Power Co. v. Greenwood County, 4 Cir., 1937, 91 F.2d 665, 676, expressly approved, 1938, 302 U.S. 485, 490, 58 S.Ct. 306, 82 L.Ed. 381; and in concurring opinion of Mr. Justice Frankfurter in Joint Anti-Fascist Refugee Committee v. McGrath, 1951, 341 U.S. 123, 152, 71 S.Ct. 624, 95 L.Ed. 817.

**8.** Section 10(a), 60 Stat. 243 (1946), 5 U.S.C.A. § 1009(a).

**9.** Tennessee Power Co. v. T.V.A., 1939, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543.

**10.** Alabama Power Co. v. Ickes, 1938, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374.

**11.** Id., 302 U.S. at page 479, 58 S.Ct. at page 304.

938

Any such agreement would be clearly illegal, and John could bring a civil action to restrain it [12] or to secure triple damages on account of it.[13]

I think we should proceed to consider other phases of the jurisdictional problem presented by this case and, if these be resolved in favor of plaintiffs, proceed to the merits as the District Court did.

12. 38 Stat. 737 (1914), 15 U.S.C.A. § 26.

13. 38 Stat. 731 (1914), 15 U.S.C.A. § 15.