The CLEVELAND ELECTRIC ILLUMINATING COMPANY, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

The NORTH AMERICAN COAL CORPORATION, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

OHIO COAL ASSOCIATION, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

Civ. A. Nos. 32881, 32882, 32886.

United States District Court
N. D. Ohio, E. D.
Dec. 17, 1956.

H. Hauser and Lee C. Howley, Cleveland, Ohio, for Cleveland Electric Illuminating Co.

Bruce W. Eaken, Crede C. Calhoun (of Jones, Day, Cockley & Reavis), Cleveland, Ohio, for the North American Coal Corp.

C. F. Taplin, Jr., Rufus S. Day, Jr., George D. Kinder, of McAfee, Grossman, Taplin, Hanning, Newcomer & Hazlett, Cleveland, Ohio, for Ohio Coal Assn.

Sumner Canary, U. S. Atty., Cleveland, Ohio, Victor R. Hansen, James E. Kilday, E. Riggs McConnell, Dept. of Justice, Washington, D. C., for United States.

Robert W. Ginnane and Samuel R. Howell, Washington, D. C., for Interstate Commerce Commission.

Dwight Buss, of Baker, Hostetler & Patterson, Cleveland, Ohio, for Baltimore & O. R. Co.

Edward A. Kaier, Philadelphia, Pa., Andrew C. Armstrong and Anthony P. Donadio, Baltimore, Md., John P. Fishwick, Roanoke, Va., John W. Hanifin, Richmond, Va., Richard J. Murphy, Chicago, Ill., W. A. Wilkinson, M. C. Smith, Jr., Howard F. Burns and Dwight B. Buss, Cleveland, Ohio, for Intervening Railroads.

Before ALLEN, Circuit Judge, JONES, Chief Judge, and McNAMEE, District Judge.

McNAMEE, District Judge.

These consolidated cases were separately brought against the United States and the Interstate Commerce Commission (hereinafter called the Commission) by the Cleveland Electric Illuminating Company, a producer and distributor of electricity and steam in the Cleveland area, the North American Coal Company, a producer and shipper of bituminous coal, and the Ohio Coal Association, an organization of coal producers, to vacate the Interstate Commerce Commission's order of March 5, 1956 in its re-opened Docket No. 25566—Intrastate Rates on Bituminous Coal Within Ohio. 298 I.C.C. 85.

Richard J. Hardy, Harold E. Spencer, Nuel D. Belnap, Chicago, Ill., Donald

The Commission's order was entered pursuant to authority conferred by Section 13(3, 4) of the Interstate Commerce Act, 49 U.S.C.A. § 13(3, 4) and requires respondent railroads to restore to their August 1, 1954 level the intrastate rates on bituminous coal transported by railroad from the Middle, Leetonia, Ohio No. 8, Cambridge and Crooksville coal mining districts in Ohio to Cleveland, Lorain, Avon Lake and Willoughby, Ohio and affected intermediate points.

The effect of the Commission's order is to eliminate a reduction of 44 cents per ton in these intrastate rates which became effective on August 2, 1954. By order entered July 6, 1956 in these proceedings this court temporarily restrained the defendants United States of America and the Interstate Commerce Commission from making effective the aforesaid order of the Commission.

Thereafter all the affected railroads except the Nickel Plate intervened as a matter of right pursuant to Section 2323, Title 28 U.S.C. and became parties defendant herein. In the proceedings before the Commission the Nickel Plate was aligned with the plaintiffs in opposition to the other railroads, but apparently that carrier has acquiesced in the Commission's order and is not a party to this action.

The order of the Commission is based upon its conclusions that the reduced intrastate rates caused undue preference to intrastate persons and localities and undue prejudice to interstate localities and shippers of bituminous coal, and unjust discrimination against interstate commerce.

Plaintiffs attack the validity of the Commission's order on several grounds, their principal contentions being that the conclusions of the Commission are not supported by necessary subsidiary findings of fact; that such conclusions are in certain respects contrary to the subsidiary findings; and that the conclusions and subsidiary findings are not supported by substantial evidence. It is contended also that there is no rational basis for the Commission's order and that the order rests upon misconceptions of the Commission as to its authority under the Interstate Commerce Act.

Scope of the Inquiry.

Before proceeding to consider the issues raised by the Complaints it is necessary to dispose of the contention of the intervening railroads that the scope of the inquiry in this action should be limited to a consideration of the validity of the finding of the Commission that the increased intrastate rates prescribed by its order are reasonable. The intervenors do not question the right of the plaintiffs to maintain this action. They concede that as shippers and a receiver of coal, plaintiffs are entitled to reasonable intrastate rates, but insist that in the enforcement of their rights plaintiffs may question only that "particular portion of the Commission's order" which is based upon its finding that the prescribed intrastate rates are reasonable.

We find the contention to be without merit. It rests upon the false premise that the railroads alone have the right to question the validity of the Commission's order as a whole. It is of course true that the order of the Commission is directed to and binding only upon the carriers. While the order of the Commission is not addressed to the plaintiffs, they are affected by its terms, and an order of the Commission made without authority is as much a denial of plaintiffs' rights to reasonable rates as an order that prescribes excessive intrastate rates but is in all other respects valid. Increased intrastate rates prescribed by the Commission in a Section 13 proceeding may be unreasonable simply because they are excessive or not supported by a valid finding of fact as to their reasonableness. But such rates may be unreasonable also where there is no legal justification for any increase at all. Plaintiffs would be equally aggrieved whether the Commission exercised its authority unreasonably in prescribing excessive intrastate rates or whether the Commission prescribed such rates under circumstances where it had no jurisdiction to act.

■ Plaintiffs have not confined their attack to any particular portion of the Commission's order. They have assailed the action of the Commission on several grounds that challenge the validity of the Commission's order in its entirety. In this state of the record we find no basis in reason for denying plaintiffs the right to prove, if they can, that the order of the Commission is unlawful in any of the respects alleged in the Complaints. Nor have the intervenors submitted any authority in support of their position. Their reliance upon Sprunt & Son v. United States, 281 U.S. 249, 50 S.Ct. 315, 74 L.Ed. 832, and Youngstown Sheet & Tube Co. v. United States, 295 U.S. 476, 55 S.Ct. 822, 79 L.Ed. 1553, is misplaced. In Sprunt [281 U.S. 249, 50 S. Ct. 318] the plaintiffs sought a review of a Section 3, 49 U.S.C.A. § 3 proceeding in which an undue preference and advantage in favor of plaintiffs was eliminated by an order of the Commission equalizing the rates on export cotton shipped to waterfront warehouses and to uptown and interior plants. The competitive advantage which plaintiffs enjoyed "was merely *an incident of, and hence was dependent upon,* the right, if any, of the carriers to maintain that [former] tariff in force." (Emphasis supplied.) The order of the Commission in that case violated no independent right of the plaintiffs, and for this reason the court held they had no independent standing to maintain the action. In Youngstown Sheet & Tube Co. v. United States, supra, the defendants, relying upon the authority of Sprunt, challenged the right of the plaintiffs as shippers and a receiver of coal to maintain an action to set aside the order of the Commission increasing intrastate rates in a Section 13 proceeding. In overruling defendants' motion to dismiss the action, the Supreme Court approved the reasoning of the District Court which distinguished the Sprunt case, and held that plaintiffs who had raised the question of the reasonableness of the increased intrastate rates were "entitled to bring and maintain this suit to set aside

the order." [295 U.S. 476, 55 S.Ct. 823.] To the same effect is Anchor Coal Co. v. United States, D.C., 25 F.2d 462. In each of the cited cases the issue was whether plaintiffs were entitled to maintain the action. In none of those cases was the question of a limitation of the scope of the inquiry presented. However, it is significant that in Youngstown and Anchor Coal Co. the independent rights of the shippers and receivers to reasonable rates were considered as ample warrant for full scale attacks upon the orders of the Commission. The contention of the intervenors is rejected.

### Background of the Case.

This is the latest chapter in a series of formal investigations of the lawfulness of the rates on the transportation of bituminous coal within the State of Ohio.

Brief reference to earlier proceedings before the Interstate Commerce Commission and the Public Utilities Commission of Ohio and the reviews of those proceedings by the United States courts and the Supreme Court of Ohio will serve to illuminate the nature of the previous controversies and shed light upon the issues here presented.

For many years prior to August 1, 1932 the rates from mining districts in Ohio to destinations in the northeastern part of the State were related by fixed differentials to the rates from mining districts in Pennsylvania and West Virginia. On August 1, 1932 the Ohio Public Utilities Commission reduced various intrastate rates to northeastern Ohio in amounts ranging from 4 cents to 29 cents per ton. The lawfulness of the reduced rates was challenged by the principal railroads (excepting the Wheeling & Lake Erie, now part of the Nickel Plate) operating in the State of Ohio, in a petition filed with the Interstate Commerce Commission in Docket No. 25566. By its decision, reported in 192 I.C.C. 413, the Commission found that the intrastate rates on bituminous coal between the points there in controversy, which include places of origin and destinations involv-

ed in the case at bar, resulted in undue preference of Ohio shippers and localities and undue prejudice to localities and shippers in interstate commerce, and in unjust discrimination against interstate commerce in violation of Section 13(4) of the Interstate Commerce Act. The Commission directed the carriers to establish and maintain intrastate rates at a level not lower than the rates in effect on July 31, 1932. The order of the Commission was upheld by a three-judge court of the Southern District of Ohio on the ground that the reduced rates were unduly preferential to persons and localities in Ohio and unduly prejudicial to persons and localities in other states; but the court did not find it necessary to pass upon the finding of the Commission that such rates resulted in discrimination against interstate commerce. State of Ohio v. United States, D.C., 6 F.Supp. 386. The action of the three-judge court was reviewed and affirmed by the Supreme Court of the United States in State of Ohio v. United States, 292 U.S. 498, 54 S.Ct. 792, 78 L.Ed. 1388.

It was said by the District Court in the above cited case and reaffirmed by the United States Supreme Court in its opinion that—

"Prior to August 1, 1932 there was maintained * * * 'a finely balanced and nicely adjusted schedule of interstate and intrastate rates on bituminous coal from Western Pennsylvania, Northern West Virginia, and Ohio coal mining districts, to Northeastern Ohio, with fixed differentials which have been regarded as essentially reasonable, in view of all the elements which must be considered in rate making.'" 6 F.Supp. 387; 292 U.S. at page 502, 54 S.Ct. at page 793.

When the intrastate rates in effect prior to August 1, 1932 were re-established the "finely balanced and nicely adjusted" schedule of differentials between intrastate and interstate points of origin was restored. At that time the rate from the Ohio No. 8 district to Cleveland was $1.74 per ton, which was ten cents per ton less than the rate from the Pittsburgh, Pennsylvania district and 25 cents per ton less than the rate from the district of Fairmount, West Virginia.

Thereafter on several occasions the Ohio Commission authorized the same general increases in intrastate rates as were authorized by the Interstate Commerce Commission for general revenue purposes in Ex Parte Nos. 115, 162, 166, 168 and 175. Specifically, on May 7, 1953, the Ohio Commission in its proceeding corresponding to Ex Parte No. 175 approved and adopted as reasonable proposed increases in the intrastate rates on bituminous coal similar to those approved by the Interstate Commerce Commission. The action of the Ohio Commission was upheld by the Supreme Court of Ohio in Toledo Edison Co. v. Public Utilities Commission of Ohio, 1954, 161 Ohio St. 221, 118 N.E.2d 531. Thus, on August 1, 1954 the intrastate rates were $2.80 per ton from the Middle and Leetonia districts and $3.07 per ton from Ohio No. 8. During the period of general rate increases the differentials between Ohio and interstate origins were not altered to any substantial extent. Early in 1954, after the Ohio Commission had found the proposed intrastate rates reasonable, the Cleveland Electric Illuminating Company, which is the largest consumer of bituminous coal in northern Ohio, opened negotiations with the railroads looking to reductions in intrastate rates, on the ground that such reductions were necessary to prevent a large-scale diversion of coal traffic to trucks.

The cost of transporting coal represents about 34% of the Illuminating Company's production costs. In an effort to reduce its costs, the Illuminating Company, in 1950, began to experiment with transporting coal by trucks. The company's trucking operations expanded beyond the experimental stage and in 1953 a substantial amount of coal was hauled by trucks from the mines at Raymilton, Pennsylvania to the company's generating plant at Ashtabula, Ohio, a point not within the scope of these proceedings. The volume of coal transported by trucks

from Raymilton, Pennsylvania to Ashtabula, Ohio increased considerably in the early part of 1954, and in April of that year the railroads reduced the Raymilton-Ashtabula interstate rate from $2.67 to $2.36 per ton. As a result of this reduction, which is still in effect, the movement of coal by rail from Raymilton to Ashtabula has been resumed. Late in 1953 and early in 1954 the Illuminating Company also received some coal at its Willoughby plant, which was transported by truck from the Middle and Leetonia districts of Ohio, and experimented with a few shipments of coal by truck from the Ohio No. 8 district.

In May, 1954 the railroads decided to meet the threatened truck competition by reducing the rates on bituminous coal 44 cents a ton from the Middle, Leetonia, Ohio No. 8, Cambridge and Crooksville districts in Ohio and to apply the same reduction in the rates on the transportation of coal originating in the Pittsburgh and Connellsville districts in Pennsylvania and the Fairmount and Moundsville districts of West Virginia. Tariffs embodying the reduced rates were filed with the Interstate Commerce Commission and with the Ohio Public Utilities Commission, to become effective August 2, 1954.

Upon the publication of the reduced rates the railroads were besieged with requests for other reductions in rates by shippers and consumers in origin districts and destinations not affected by the 44 cent reduction. As a result of these widespread demands the railroads decided that the entire matter ought to receive further consideration before the reduced rates became effective. The railroads therefore made application to postpone the effective date of the reduction in both intrastate and interstate rates. The Interstate Commerce Commission granted the postponement as to interstate rates, and the proposal to reduce such interstate rates was cancelled after the Commission's order in this proceeding was issued. The Ohio Public Utilities Commission refused to comply with the railroads' request to stay the effective date of the reduced intrastate rates. These rates therefore became effective as of August 2, 1954. Immediately thereafter the Nickel Plate applied the reduced intrastate rates and as a consequence the other railroads were compelled, for competitive reasons, to adopt the same rates on intrastate shipments of coal.

Shortly after August 2, 1954 all the railroads, except the Nickel Plate, filed a petition with the Interstate Commerce Commission alleging that the reduced intrastate rates constituted a violation of the Commission's order of May 2, 1933 in No. 25566—192 I.C.C. 413,—and sought enforcement of that order or such other relief as might be warranted. On September 21, 1954 the Interstate Commerce Commission re-opened the 1933 case to determine whether the intrastate rates on bituminous coal to Cleveland, Lorain, Avon Lake, Willoughby, and intermediate points contravened—(a) the requirements of the order of May 2, 1933, and (b) the provisions of Section 13(3, 4) of the Interstate Commerce Act.

After extensive hearings the Commission, on March 5, 1956, found that the reduced intrastate rates in issue did not violate its order of May 2, 1933. However, the Commission did find that those rates "are and for the future will be unduly preferential of Ohio shippers and localities and unduly prejudicial to interstate localities and shippers from origin districts in Pennsylvania and West Virginia, particularly the Moundsville and Fairmount districts" and that said rates are causing unjust discrimination against interstate commerce. On the basis of these findings the Commission entered its order requiring that the intrastate rates in effect on August 1, 1954 be re-established on or before June 28, 1956, upon not less than 30 days' notice. By order entered May 21, 1956 the Commission postponed the effective date of the increases in the intrastate rates from June 28, 1956 to July 9, 1956 and shortened the notice requirement from 30 to 10 days, and on June 25, 1956 it denied petitions for re-argument and further

consideration filed by the Nickel Plate Railroad and the plaintiffs herein.

## Is the Commission's Order Valid?

Immediately prior to the effective date of the reduced rates there existed that "finely balanced and nicely adjusted" schedule of differentials which had been maintained over the course of many years. The reduction of 44 cents per ton in the intrastate rates caused a radical derangement in the system of differentials. For example, the rate from the Ohio No. 8 district, which is the principal Ohio district shipping coal to the Cleveland area, was lowered from $3.07 a ton to $2.63. Before the reduction the rate from this district was 12 cents less than the Pittsburgh rate of $3.19. As a result of the reduction, the differential between these points of origin rose to 56 cents. The spread between the rates from Ohio No. 8 and the Fairmount, West Virginia district increased from 30 cents a ton to 74 cents when the reduced rates became effective; and the differential between the Middle district of Ohio and the Fairmount district was increased from 57 cents to $1.01 per ton.

The Commission found there is keen competition in the Cleveland area between the Ohio districts from which the reduced rates apply and some of the interstate districts, particularly the Fairmount, Moundsville and Butler-Mercer districts, and that shippers in the latter districts have been adversely affected by the wide spread between the intrastate and interstate rates to the Cleveland area.

The Commission found also that conditions incident to the transportation of coal from origins in Ohio and from origins in adjoining States to the Cleveland area are similar; that the pertinent interstate rates are reasonable, and that the re-establishment of the pre-existing intrastate rates will not result in rates that are unreasonable.

In its Conclusion No. 4 the Commission found—

"4. The intrastate rates here in issue from the Ohio No. 8, Middle, Leetonia, Cambridge, and Crooksville districts to the destinations defined in finding 1 are, and for the future will be, unduly preferential of Ohio shippers and localities and unduly prejudicial to interstate localities and shippers of bituminous fine coal from origin districts in Pennsylvania and West Virginia, particularly the Moundsville and Fairmount districts, to the same destinations."

Plaintiffs attack Conclusion No. 4 upon several grounds. They assert that the basic facts in the Commission's report show that the reduced intrastate rates are relatively higher than the interstate rates when tested by transportation standards. In support of this contention they rely upon statements in the Commission's report showing that the average distance of intrastate shipments to the Illuminating Company in 1953 was 131.8 miles, and the average revenue $3.05 per ton which, by giving effect to the 1954 reduction of 44 cents, would be $2.61 per ton. They compare this revenue to the earnings of $2.52 per ton for an average haul of 125.6 miles on interstate shipments to and from Ohio in 1953. This is not an apt comparison. There is no relevant relation between rates on intrastate shipments to the Illuminating Company and rates on a heterogeneous combination of shipments into and out of Ohio from various points of origin to diverse destinations. We are concerned here with the relation between intrastate and interstate rates to a common destination area. It is obvious that if the average distance of intrastate movements of coal to the Illuminating Company was 131.8 miles, the average distance of the interstate shipments to that company's plants from the more remote interstate districts would be greater and that the average revenue on such longer hauls at higher interstate rates would be in excess of the average revenue on the shorter haul of 131.8 miles. It is urged also that the earnings per ton mile on shipments on the reduced intrastate rates were greater than the per ton mile earn-

ings of the interstate shipments moving on the higher rates. But even if this were true, it would not demonstrate that the intrastate rates were relatively higher. It is an axiom of rate-making that the longer haul yields a lower per ton mile return. State of Ohio v. United States, 292 U.S. 498, 54 S.Ct. 792, 78 L. Ed. 1388.

Plaintiffs also attack the finding of the Commission that the truck competition from the Middle and Leetonia districts was not sufficient to warrant a change in the rates from those and other districts. The question whether there is sufficient actual and potential truck competition to warrant a reduction in intrastate rates is a vital issue in the case. As shown above, it was the threat of truck competition that caused the railroads voluntarily to reduce their rates on the transportation of coal. In discharging its task of determining whether such competition was a substantial threat to the business of the railroads, the Commission considered all of the evidence relative to the volume of trucking actually done as well as the indicated purpose of the Illuminating Company to truck one million tons of coal if the prior intrastate rates were re-established.

The hearings before the Commission were held by an examiner who submitted a proposed report in which he found *inter alia* that there was no truck competition from the Crooksville, Cambridge and Ohio No. 8 districts, but that "There is actual and substantial truck competition from the Middle and Leetonia districts in Ohio to the Cleveland area." The Commission agreed with the examiner's findings as to the absence of truck competition from the Crooksville, Cambridge and Ohio No. 8 districts. (These findings are supported overwhelmingly by the evidence and are not seriously questioned.) However, the Commission found that "There is some truck competition from the Middle and Leetonia districts, but it is indicated that it is not of sufficient severity to warrant different treatment of the rates from those dis-

tricts and the rates from the other districts."

■ It is suggested that in the above finding the Commission was referring only to actual truck competition. The language of the finding may be wanting in specificity, but there can be no doubt that by the phrase "some truck competition" the Commission meant potential as well as actual truck competition. While the courts insist upon findings that are formulated in clear and definite terms, we have it on high authority that it is enough if the Commission expresses its findings with sufficient clarity "to enable the parties and ourselves to understand with a fair degree of assurance why the Commission acts as it does. Eastern Central Motor Carriers Association v. United States, 321 U.S. 194, 211–212, 64 S.Ct. 499, 88 L.Ed. 668.

It would serve no purpose to review at length the evidence on this issue, which is set out with great particularity in the Commission's report. All pertinent facts, both favorable and unfavorable to the position of plaintiffs, were considered by the Commission.

The actual trucking of coal to the Illuminating Company plants from Raymilton, Pennsylvania and from the Middle and Leetonia districts in Ohio was done by producers who supplied the coal. It was the Commission's view that the trucking rates charged by the producers were not reliable indicators of fair rates for that mode of transportation. In the two instances where the trucking rates from Raymilton were reduced ten cents a ton by the producers, these reductions were offset by contemporaneous increases in like amounts in the price of the coal, with the result that the total delivered price to the Illuminating Company remained unchanged. The average rate of trucking from the Middle and Leetonia districts was said to be $2.80 per ton, which is the same as the prior rail rate from the same districts. It was shown that if the Illuminating Company embarked upon a program of trucking upwards of a million tons of coal from the Middle and Leetonia districts and from

Raymilton, this would require the company either to purchase the necessary equipment and do the hauling itself, or to engage a competent trucking company for that purpose. In this connection the Illuminating Company submitted four studies of the cost of such large scale trucking. Two of these studies were prepared by companies that had no experience in trucking and they contain no items for profit. The third study, which was merely a comparison of the cost of trucking coal with an estimate of the cost of hauling iron and steel, was likewise deficient in its omission of any consideration of profit. The fourth study contemplated the use of a light-weight tractor and an aluminum trailer which, the Commission observed, had never been tested and "so far as appears it is merely in the blueprint stage." Evidence of many other factors bearing upon this issue were also referred to in the Commission's report. These included a survey of the Nickel Plate Railroad showing the amount of trucking to the Cleveland area in the first eleven months of 1954; the increased use of trucks for the delivery of coal to the cities of Akron, Canton and Massillon from the nearby mines in the Middle and Leetonia districts; the large general increase in the use of trucks for transporting coal in Ohio, and the absence of such an increase in trucking to the Cleveland area. There was evidence also of a substantial increase in the tonnage of coal transported by rail to the Cleveland area in recent years.

■■ It may be that on the basis of the evidence, reasonable minds might disagree as to the extent of the probable future truck competition from the Middle and Leetonia districts. However, it is the function of the Commission to weigh the evidence and draw the inferences therefrom. This court cannot substitute its judgment or the judgment of the examiner for that of the Commission. In determining the issue of truck competition, as well as all other factors involved in rate-making, the Commission is peculiarly qualified by training and experience to form sound judgments. Under our limited jurisdiction it is not for us to say whether we would have reached the same conclusion on the same evidence or whether we disagree with the reasoning of the Commission or the wisdom of its determination. It is enough that the Commission's finding on the issue of actual and potential truck competition, which necessarily rests upon a compound of fact and prophecy, is supported by substantial evidence and a fair and informed forecast of future probabilities.

■ We have considered all other arguments in opposition to Conclusion No. 4 but find them to be without merit. On the basis of the record we hold that Conclusion No. 4 is adequately sustained by subsidiary findings of fact which are supported by substantial evidence, and that the order of the Commission is justified by its conclusion that intrastate rates in issue have caused undue preference and prejudice between persons and localities in intrastate and interstate commerce.

Some of the interstate shippers testified that before the intrastate rates were reduced they had sustained losses in business to the Cleveland area by virtue of truck competition in Ohio. As the Commission noted, the record showed that if the intrastate rates were increased there would be a resumption of truck competition which would be a more serious source of injury to these shippers than to shippers from the Ohio districts. In view of this, the interstate shippers suggested that the pre-existing differentials be restored by reducing the interstate rates instead of increasing the rates on intrastate shipments. The Commission declined to adopt the suggestion on the ground that it was without power to reduce the interstate rates in this proceeding, which, in its view, presented the sole issue of the lawfulness of intrastate rates. Plaintiffs contend that the Commission was in error in thus construing its authority under Section 13(4) and urge that we remand the case for further proceedings "consistent with the proper construction of the governing statute." Plaintiffs recognize, however, that this court cannot compel the Com-

mission to reduce the interstate rates and that even if we reversed the Commission on this point, the effect of such an adjudication would be to hold merely that the Commission might choose between the alternatives of raising the intrastate rates or reducing the rates from the interstate districts.

However, the plaintiffs suggest that there are statements in the report from which an inference arises that if the Commission had not considered itself without power to do so, it would have reduced the interstate rates. We do not agree. The Commission's disclaimer of power to reduce interstate rates was unnecessary. It is clear from a reading of the report that the Commission's refusal to reduce such rates was also based upon grounds entirely unrelated to its presumed lack of power to do so. Furthermore, the Commission's findings that the intrastate rates were unlawful and that the interstate rates were reasonable, effectively foreclose the possibility of any reduction in the latter rates upon a remand of the case. We find no purpose to be served in passing upon this question and, for the reasons indicated, decline to do so.

▆▆▆▆ The Commission's order is based also upon its ultimate finding No. 5 that the intrastate rates here in issue are causing unjust discrimination against interstate commerce. In dealing with undue preference and prejudice between persons and localities in relation to interstate commerce the question is one of the relation of rates to each other. In dealing with the right of the Commission to change intrastate rates in the interest of the carrier's revenue, the question is that of the relation of rates to revenue. State of Florida v. United States, 282 U.S. 194, 214, 51 S.Ct. 119, 75 L.Ed. 291.

▆▆▆▆ The controversy here, so far as it relates to the revenue issue, involves questions as to the adequacy of the Commission's subsidiary findings. Whether such findings are as definite and precise as required by law, and whether all necessary subsidiary facts are stated in the report, present close and interesting questions involving the application of the principles laid down in State of Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291; State of North Carolina v. United States, 325 U.S. 507, 65 S. Ct. 1260, 89 L.Ed. 1760; King v. United States, 344 U.S. 254, 73 S.Ct. 259, 97 L. Ed. 301; Mississippi Public Service Commission v. U. S., D.C., 124 F.Supp. 809, affirmed 349 U.S. 908, 75 S.Ct. 599, 99 L.Ed. 1244. However, a determination of those questions is not essential to a definitive holding in respect of the validity of the Commission's order. Having held that the order of the Commission is justified by its finding of undue preference and prejudice, we are not required to pass upon the validity of its conclusion in respect of revenue discrimination. It is firmly settled that an order of the Commission prescribing intrastate rates in a Section 13 proceeding may be justified upon the sole ground that the intrastate rates in issue have caused undue preference and prejudice between persons and localities in relation to interstate commerce. State of Ohio v. United States, 292 U.S. 498, 54 S.Ct. 792, 78 L.Ed. 1388; Louisiana Public Service Commission v. Texas & N. O. Railroad Co., 284 U.S. 125, 52 S.Ct. 74, 76 L.Ed. 201.

In its review of the original order in this proceeding in 1932 the three-judge court rested its decision upon this single ground, although that case also involved the issue of unjust discrimination against interstate commerce. State of Ohio v. United States, D.C., 6 F.Supp. 386. Considerations similar to those that militated against a decision of the revenue question in the earlier case are present here, and for like reasons we find it unnecessary to decide the issue raised as to the Commission's Conclusion No. 5.

A decree may be prepared in accordance with the foregoing.

ALLEN, Circuit Judge, and JONES, Chief Judge, concur.